gan, Detroit Receiving Hospital and University Health Center, Forsyth Medical Center, the Johns Hopkins Hospital, Part of the Johns Hopkins Health System, Kettering Medical Center, Lincoln Medical & Mental Health Center, Loma Linda University Medical Center, Lutheran General Hospital, Medical College of Pennsylvania and Hospital, Mercy Catholic Medical Center—Misericordia Division, Mercy Hospital and Medical Center, Methodist Hospital of Indiana, Ohio State University Hospital, Oregon Health Sciences University Hospital, Our Lady of Mercy Medical Center, Riverside Methodist Hospitals, Saint Francis Medical Center, St. Anthony Hospital, Tri–City Medical Center, University of California Medical Centers at Los Angeles, Irvine and San Diego, University Hospital at State University of New York at Stony Brook, University Hospital at the University of New Mexico School of Medicine, University of Massachusetts Medical Center, and University Medical Center (Tucson), Defendants.

No. 90–CV–1086A.

United States District Court,
W.D. New York.

June 20, 2003.

Gregory F. DANIEL, M.D.,
et al., Plaintiffs,

v.

AMERICAN BOARD OF EMERGENCY MEDICINE, Henry A. Thiede, M.D., Frank A. Disney, M.D., Council of Emergency Medicine Residency Directors, Children's Hospital (San Diego), Children's Hospital of Michi-

Jaeckle, Fleischmann & Mugel, LLP (Ralph L. Halpern, Mitchell J. Banas, Jr., and Mary C. Fitzgerald, of Counsel), Buffalo, NY, Shearman & Sterling, (George J. Wade, Kathleen M. Comfrey, of Counsel), New York City, for Plaintiffs.

Jones, Day, Reavis & Pogue (Robert A. Rawson, Jr., Jeffery D. Ubersax, Elizabeth A. Grove, and Jeffery Saks, of Counsel), Cleveland, OH, for Defendants American

Board of Emergency Medicine, Henry A. Theide, M.D. and Frank A. Disney, M.D.

Phillips, Lytle, Hitchcock, Blaine & Huber (Robert E. Glanville, of Counsel), Buffalo, NY, for Defendants American Board of Emergency Medicine, Council of Emergency Medicine Residency Directors and as Liaison Counsel for all Defendants.

## ORDER

ARCARA, District Judge.

This antitrust case was referred to Magistrate Judge Leslie G. Foschio, pursuant to 28 U.S.C. § 636(b)(1), on April 24, 1991.[1] On February 24, 1994, plaintiffs filed a motion for class certification. On May 4, 2000, defendants filed a cross-motion to dismiss the Second Amended Complaint. On January 3, 2003, Magistrate Judge Foschio filed an Amended Report and Recommendation, recommending, *inter alia,* that defendants' cross-motion to dismiss the Second Amended Complaint be granted because plaintiffs lack antitrust standing. Magistrate Judge Foschio found that plaintiffs lack antitrust standing because: (1) they have failed to allege a cognizable antitrust injury; and (2) they are not "efficient enforcers" of the antitrust laws. In the event that this Court were to reject his recommendation that the case be dismissed, Magistrate Judge Foschio also recommended, in the alternative, that plaintiffs' motion for class certification be granted under Federal Rule of Civil Procedure 23(b)(3) and denied under Federal Rule of Civil Procedure 23(b)(2).

Plaintiffs and defendants both filed objections to the Report and Recommendation on February 14, 2003. They both filed responses to the objections on March 14, 2003, and replies thereto on March 28, 2003. Oral argument on the objections was held on May 23, 2003.

Pursuant to 28 U.S.C. § 636(b)(1), this Court must make a *de novo* determination of those portions of the Report and Recommendation to which objections have been made. Upon a *de novo* review of the Report and Recommendation, and after reviewing the submissions and hearing argument from the parties, the Court adopts Magistrate Judge Foschio's recommendation that the Court grant defendants' motion to dismiss the Second Amended Complaint.[2]

As Magistrate Judge Foschio found in his thorough and well-reasoned Report and Recommendation, the plaintiffs, in their Second Amended Complaint, have failed to allege antitrust standing. Antitrust plaintiffs "must plead and prove that the injury they have suffered derives from some anticompetitive conduct and is the type the antitrust laws were intended to prevent." *Todorov v. DCH Healthcare Auth.,* 921 F.2d 1438, 1450 (11th Cir.1991). Here, plaintiffs seek as damages the loss of the higher income they allegedly would have received had they been able to become board certified through the practice track. However, as the Seventh Circuit held in the analogous case of *Sanjuan v. American Bd. of Psychiatry & Neurology,*

---

1. The background of this case is discussed in several previous decisions, *Daniel v. American Bd. of Emergency Medicine,* 235 F.Supp.2d 194 (W.D.N.Y.2002); *Daniel v. American Bd. of Emergency Medicine,* 237 F.Supp.2d 336 (W.D.N.Y.2002); *Daniel v. American Bd. of Emergency Medicine,* 212 F.R.D. 134 (W.D.N.Y.2002); *Daniel v. American Bd. of Emergency Medicine,* 988 F.Supp. 112 (W.D.N.Y.1997); *Daniel v. American Bd. of Emergency Medicine,* 988 F.Supp. 127

(W.D.N.Y.1997); *Daniel v. American Bd. of Emergency Medicine,* 1997 WL 785635 (W.D.N.Y. Nov. 19, 1997) and *Daniel v. American Bd. of Emergency Medicine,* 802 F.Supp. 912 (W.D.N.Y.1992). The Court shall assume familiarity with these decisions.

2. Because the Court is granting defendants' motion to dismiss, it need not address plaintiffs' motion for class certification.

*Inc.*, 40 F.3d 247, 251 (7th Cir.1994), *cert. denied*, 516 U.S. 1159, 116 S.Ct. 1044, 134 L.Ed.2d 191 (1996), a plaintiff-doctor's inability to charge higher fees because he or she has been denied board certification does not constitute a cognizable form of injury under the antitrust laws. "[T]he claim that a practice reduces (particular) producers' incomes has nothing to do with the antitrust laws, which are designed to drive producers' prices down rather than up." *Id.* (citations omitted). "Plaintiffs, who want to obtain a credential that will help them charge higher prices, have pleaded themselves out of court on the[ir] antitrust claim." *Id.* at 252.

Moreover, as Magistrate Judge Foschio found, in addition to failing to allege an antitrust injury, this action must be dismissed because, under the facts and circumstances present here, plaintiffs are not "efficient enforcers" of the antitrust laws and therefore lack standing for that reason as well. The Supreme Court has held that for standing to sue under Section 4 or Section 16 of the Clayton Act, in addition to meeting the threshold requirement of having alleged an antitrust injury, a party seeking redress must also be a "proper plaintiff" under the antitrust laws. *Cargill, Inc. v. Monfort of Colorado*, 479 U.S. 104, 110 n. 5, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986); *see also Todorov*, 921 F.2d at 1450 (to have antitrust standing, a plaintiff must be "an efficient enforcer of the antitrust laws"). Here, plaintiffs' objective is to advance their own economic interests by obtaining access to the same higher levels of compensation created by the charged conspiracy. In other words, plaintiffs' economic incentive is to keep prices higher and to share in those higher prices with the members of the alleged conspiracy. Such a motivation is inimical to being an "efficient enforcer" of the antitrust laws.

In their objections, plaintiffs ask that the Court grant them a further opportunity to amend their complaint to state that they seek only to recover the difference between their actual earnings and the amount they would have earned in a competitive market absent the conspiracy. However, such an amendment would be futile because it would still not sufficiently plead an antitrust injury. The bottom line is that, even with the amendment, plaintiffs seek to increase the price they charge to consumers as compared to the price charged by other non-board certified emergency medicine physicians. As such, the amendment does not allege a cognizable antitrust injury. *Sanjuan*, 40 F.3d at 251–52. Furthermore, this case is already 13 years old. The amendment proposed by the plaintiffs would be inconsistent with the now-developed record. Throughout the case, plaintiffs have claimed that they are entitled to the same supercompetitive prices earned by board-certified physicians. They now want to change their entire theory of the case in order to avoid dismissal. Even now, however, they are unable to offer an expert report that would support their theory, despite having had years to secure such a report. For all these reasons, the Court denies plaintiffs' request to file another amended complaint.

In sum, for the reasons set forth both in Magistrate Judge Foschio's Report and Recommendation and herein, the Court grants defendants' motion to dismiss the Second Amended Complaint. The Clerk of Court is hereby ordered to take all steps necessary to close the case.

IT IS SO ORDERED.

## AMENDED REPORT AND RECOMMENDATION

FOSCHIO, United States Magistrate Judge.

### *JURISDICTION*

This matter was referred, pursuant to 28 U.S.C. § 636(b)(1)(A) & (B), to the under-

signed on April 24, 1991 by Hon. Richard J. Arcara for all pretrial matters. The matter is presently before the court on Plaintiffs' motion for class certification, filed February 24, 1994 (Doc. No. 69) ("Plaintiffs' Motion"), and Defendants' cross motion to dismiss the Second Amended Complaint, pursuant to Fed. R.Civ.P. 16(b)(1) filed May 4, 2000 (Doc. No. 773) ("Defendants' Cross Motion").

## BACKGROUND

In their Second Amended Complaint, brought pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. § 15 ("Section 4"), 15 U.S.C. § 26 ("Section 16"), Plaintiffs alleged violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. § § 1, 2, and sought monetary damages and injunctive relief. Prior proceedings in this action include *Daniel v. American Board of Emergency Medicine, et al,* 802 F.Supp. 912 (W.D.N.Y.1992) (*"Daniel I "*) (sustaining Amended Complaint against motion to dismiss); *Daniel v. American Board of Emergency Medicine, et al.,* 988 F.Supp. 112 (W.D.N.Y.1997) (*"Daniel II "*); and, *Daniel v. American Board of Emergency Medicine, et al.,* 988 F.Supp. 127 (W.D.N.Y.1997) (*"Daniel III "*). Discovery on the merits of Plaintiffs' claims has been stayed pending resolution of the numerous motions filed by Defendants attacking the Second Amended Complaint and Defendants' opposition to Plaintiffs' instant motion for class certification.

In a Report and Recommendation filed on January 16, 1996 (Doc. No. 435), the undersigned recommended dismissal of ten Defendants, including Tri–City Medical Center, University of California Medical Centers at Los Angeles, Irvine and San Diego, University of Massachusetts Medical Center, University Hospital of University of New Mexico School of Medicine, Oregon Health Services University Hospital, Ohio State University Hospital, University Hospital at State University of New York at Stony Brook, and Lincoln Medical and Mental Health Center, on grounds of 11th Amendment immunity, state action immunity, Local Government Antitrust Act immunity, and personal jurisdiction. District Judge Richard J. Arcara adopted the Report and Recommendation in an Order filed on November 19, 1997 (Doc. No. 580). *Daniel III.* Based on later filed motions seeking dismissal upon 11th Amendment and state action immunity grounds, the undersigned recommended dismissing four additional Defendants. Report and Recommendation filed January 20, 2000 (Doc. No. 751) (recommending dismissal of Defendants Kettering Medical Center, Children's Hospital—San Diego, and University Medical Center Corporation (Tucson, Arizona)) and Report and Recommendation filed September 27, 2001 (Doc. No. 830) (recommending dismissal of Defendant Riverside Medical Center, but recommending against dismissal of Defendant Our Lady of Mercy Medical Center). In a Report and Recommendation filed on February 12, 1999 (Doc. No. 642), the undersigned recommended that final judgment, pursuant to Fed.R.Civ.P. 54(b), be entered as to Defendants Tri–City Medical Center, University of California Medical Centers at Los Angeles, Irvine and San Diego, University of Massachusetts Medical Center, University Hospital of University of New Mexico School of Medicine, Oregon Health Services University Hospital, Ohio State University Hospital, University Hospital at State University of New York at Stony Brook, and Lincoln Medical and Mental Health Center.

Judge Arcara adopted the Reports and Recommendations by Orders filed August 21, 2002. Doc. No. 846 (adopting Report and Recommendation filed February 12, 1999 (as amended by Order filed October 9, 2002 (Doc. No. 862))), Doc. No. 847

(adopting Report and Recommendation filed September 27, 2001), and Doc. No. 848 (adopting Report and Recommendation filed January 20, 2000). Final judgments dismissing all the above Defendants were filed on August 23, 2002 and on October 10, 2002. Doc. Nos. 849, 850, 851 and 863.[1] Plaintiffs have appealed such dismissals on September 19 and November 5, 2002; Tri–City Medical Center cross appealed on October 2, 2002. (Doc. Nos. 868 and 857, respectively). Two of the original Defendants have settled the claims against them including Porter Memorial Hospital (Stipulation and Order filed September 21, 1994 (Doc. No. 313)), and Medical College of Pennsylvania and Hospital (Order filed May 29, 2001 (Doc. No. 822)). The court is also informed that three previously dismissed Defendants, Oregon Health Sciences University, Children's Hospital—San Diego, and University Medical Center—Tucson, settled in principle with Plaintiffs. Doc. No. 870.

Plaintiffs' Memorandum of Law in Support of the motion for class certification was filed on February 24, 1994 (Doc. No. 70). At Defendants' request, limited discovery was permitted, by order dated October 28, 1998, directed to Plaintiffs' Motion (Doc. No. 630). Plaintiffs' Revised Memorandum of Law in Support of Class Certification was filed on March 6, 2000 ("Plaintiffs' Revised Memorandum") (Doc.

No. 761) together with a Declaration of Jeremy R. Kasha, Esq. in Support of Plaintiffs' Motion for Class Certification dated March 4, 2000 (Doc. No. 762) with attached exhibits. Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification and in Support of Defendants' Cross Motion to Dismiss for Lack of Standing along with Declaration of Jeffrey D. Ubersax, Esq. ("Ubersax Declaration") (Doc. No. 775) with attached exhibits was filed May 4, 2000 ("Defendants' Memorandum") (Doc. No. 774). Plaintiffs' Reply Memorandum of Law in Support of Plaintiffs' Motion for Class Certification and in Opposition to Defendants' Cross Motion to Dismiss was filed July 17, 2000 ("Plaintiffs' Reply Memorandum") (Doc. No. 797). Defendants' Surreply Memorandum in Support of Defendants' Cross Motion to Dismiss (Doc. No. 811) and Defendants' Surreply Memorandum in Opposition to Plaintiffs' Motion for Class Certification (Doc. No. 812) were filed on July 31, 2000 ("Defendants' Surreply Re: Standing") and ("Defendants' Surreply Re: Class Certification"), respectively. By letter dated October 24, 2001, Plaintiffs provided additional authority in support of their class certification motion (Doc. No. 864); Defendants responded by letter dated October 29, 2001 (Doc. No. 865). Oral argument was conducted on November 8, 2002.[2]

---

**1.** By letter dated November 8, 2002 (Doc. # 870), the court was advised that Hospital Defendants, Children's Hospital of Michigan, Detroit Receiving Hospital and University Health Center, The Johns Hopkins Health System, Loma Linda University Medical Center and St. Anthony Hospital—Central are presently represented by LeBoeuf, Lamb, Greene & MacRae ("LeBoeuf, Lamb"), Jonathan A. Damon, of counsel; and that LeBoef, Lamb also represents University of California Medical Centers at Los Angeles, Irvine, and San Diego, University of Massachusetts Medical Center, University Hospital at the University of New Mexico School of Medicine, Ore-

gon Health Sciences University Hospital, Children's Hospital—San Diego and University Medical Center (Tuscon, Arizona).

**2.** Both sides handed up supplemental authorities following oral argument, the court has reviewed such authorities, however, because of their bulk, the submissions were not filed. Plaintiffs and Defendants submitted additional arguments and authorities by letters dated November 12th, 13th, 18th and 21st, 2002 (Doc. Nos. 871, 872, 873, and 874, respectively).

Based on the following, Defendants' cross motion to dismiss should be GRANTED; alternatively, Plaintiffs' motion for class certification pursuant to Rule 223(b)(3) should be GRANTED; alternatively, Plaintiffs' motion for certification pursuant to Rule 23(b)(2) should be DENIED.

### FACTS [3]

Plaintiffs originally included 176 physicians who claimed to be eligible based upon prior experience in the practice of emergency medicine, to take Defendant American Board of Emergency Medicine's (ABEM) certification examination,[4] Second Amended Complaint, Exhibit A. Specifically, prior to June 30, 1988, ABEM permitted physicians to sit for its certification examination, consisting of both written and oral components, based upon completion either of an approved residency in emergency medicine or of 7,000 hours and 60 months of emergency room medical practice, with 2,800 hours accumulated within 24 consecutive months, and an accumulation of 50 hours of continuing medical education in emergency medicine deemed acceptable to ABEM for each complete year in practice after 1973 ("the practice track"). Second Amended Complaint ¶¶ 6, 7, 50. Upon passing both components of the ABEM examination, physicians are granted ABEM Diplomate sta-

tus. *Id.* ¶ 3. After June 30, 1988, in order to qualify to sit for the ABEM examination, a physician who wished to obtain ABEM certification was required to successfully complete an approved residency training program in emergency medicine. Second Amended Complaint ¶¶ 6, 7, 50. However, special practice track eligibility for the ABEM examination remained available until 1995 to physicians certified by the American Board of Internal Medicine ("ABIM") and who also served in significant academic positions. Second Amended Complaint ¶¶ 11, 71–73. Plaintiffs claim they represent a class of 14,000 physicians who but for the closure of the practice track would have applied to take the ABEM certification examination. *Id.* ¶¶ 23–24, 44(a).[5]

In addition to ABEM, Defendants include two members of ABEM's board of directors, Henry A. Thiede, M.D. and Frank A. Disney, M.D., 28 hospitals which are alleged to offer residency programs in emergency medicine ("Hospital Defendant(s)"), Second Amended Complaint ¶¶ 4, 30, 31, 34, Exhibit B,[6] and the Council of Emergency Residency Directors ("CORD"), an association of directors of residency programs in emergency medicine. Second Amended Complaint ¶¶ 32–33. It is alleged that ABEM, CORD, and the Hospital Defendants conspired unlaw-

3. Taken from the pleadings and papers filed in connection with the instant motion and cross motion.

4. As a result of prior motions to dismiss and withdraw, the number of Plaintiffs has been reduced to 154.

5. At oral argument, Plaintiffs stated the present number was now closer to 10,000.

6. As noted, 14 Hospital Defendants have been dismissed based on various immunity and personal jurisdiction grounds, and two Hospital Defendants were dismissed following settlements with Plaintiffs. Thus, 12 Hospital

Defendants, all private organizations, remain in the action, including Forsyth Medical Center, Children's Hospital of Michigan, Detroit Receiving Hospital and University Health Center, the Johns Hopkins Hospital, Part of the Johns Hopkins Health System, Loma Linda University Medical Center, Lutheran General Hospital, Mercy Catholic Medical Center—Misericordia Division, Mercy Hospital and Medical Center, Methodist Hospital of Indiana, Our Lady of Mercy Medical Center, Saint Francis Medical Center and St. Anthony Hospital.

fully to close, and keep closed, ABEM's practice track as a basis for eligibility to gain ABEM certification. *Id.* ¶ 34. Plaintiffs also assert that several professional organizations in the field of medicine, not named as defendants in the action, including the American College of Emergency Physicians, Society for Academic Emergency Medicine, ABIM, as sponsoring organizations of ABEM, are also co-conspirators. *Id.* ¶ 38. Plaintiffs further charge that other unidentified hospitals offering residency training programs in emergency medicine are part of the alleged conspiracy as well as the executive director of ABEM, 40 of its former officers and directors, and 17 physicians who served as directors of their respective emergency medicine residency programs. *Id.* ¶ ¶ 34, 41–43; Exhibits C, D.

Plaintiffs claim Defendants conspired, among themselves and with the other organizations and persons not named as defendants, to restrain trade in and monopolize the national market for emergency medicine physicians certified by ABEM ("ABEM physicians") and physicians who have qualified for the ABEM certification examination pursuant to the ABEM medical residency program requirement ("ABEM eligible physicians"), as offered by Hospital Defendants, the only means (except of the special practice qualification track for certain ABIM physicians) by which a physician can qualify to take the ABEM examination following closure of the practice track in 1988. Second Amended Complaint ¶ ¶ 3–4, 51, 91–92.[7] For residency track applicants who began their residency training prior to July 1, 1997, ABEM required successful completion of 36 months of post-medical school training with 24 months controlled by an accredited emergency medicine training program; thereafter, 36 months of approved residency study was required. *Id.* ¶ 51. Plaintiffs allege Defendants have, through the conspiracy to close the practice track and keep it closed, artificially reduced the availability of ABEM physicians and ABEM eligible physicians in the national market for such services with a resulting noncompetitively created increase in the remuneration paid to such physicians. *Id.* ¶ ¶ 94–95. During the 12 year period of availability of the practice track, 8,000 physicians obtained ABEM Diplomate status of which 7,000 qualified through the practice track. Second Amended Complaint ¶ 7.

As a consequence Defendants' actions in relation to the practice track's closure, Plaintiffs claim that Defendants' restraint of trade, monopolization, and attempted monopolization of the market for ABEM physicians and ABEM eligible physicians caused Plaintiffs to "receive substantially less remuneration than ABEM certified physicians (in an average amount of less than $50,000 annually)." *Id.* ¶ 104. Plaintiffs also allege the loss of "increases in remuneration for which they would otherwise be qualified." *Id.* ¶ 109. Additionally, Plaintiffs claim several other forms of damage including numerous disadvantages and impediments to their professional advancement, *e.g.*, loss of the chance for increased professional prestige, research opportunities supported by financial grants from various funding sources, greater professional mobility, and academic appointments in the field of emergency medical practice. *Id.* ¶ ¶ 13, 88(a), (e), (g), (k).

---

**7.** Following commencement of this action, the Board of Certification of Emergency Medicine ("BCEM") was established which permitted physicians to become certified with an emergency medicine residency qualification or, until 1997, based on 10,000 hours of experience in emergency medicine practice over at least six years. Defendants' Memorandum at 19. As of May 2000, 60 Plaintiffs have become BCEM certified.

Plaintiffs further assert that Defendants' closure of the ABEM practice track not only reduces competition in the market for the services of ABEM physicians and ABEM eligible physicians, but also misleads the public into a belief that emergency physicians who are not ABEM certified are less capable than ABEM physicians or ABEM eligible physicians. Second Amended Complaint ¶ 16. Plaintiffs contend that Hospital Defendants obtained benefits from the conspiracy through the increased availability of resident emergency medicine physicians to staff their respective emergency room programs at a relatively lower cost. *Id.* ¶ 14. Additionally, Hospital Defendants are alleged to benefit from the conspiracy through increased residency enrollments, greater federal funding and larger Medicare and Medicaid reimbursement rates, more research grants, and higher donations and greater opportunities for endowed teaching chairs. *Id.* ¶ 90.

Plaintiffs state the putative class to be certified, pursuant to Rule 23 of the Federal Rules of Civil Procedure, include physicians who, in addition to the Plaintiffs, are physicians presently, or through passage of time could have, qualified for the ABEM certification examination under the practice track. Second Amended Complaint ¶ 44(a). Plaintiffs further allege that their claims are typical of those to be asserted by the class and that common questions of fact and law predominate over individual issues including the existence and effect upon Plaintiffs and the proposed class of the alleged conspiracy and anticompetitive conduct by Defendants and the other described coconspirators. *Id.* ¶ 44(d).

Plaintiffs further allege that a class action is suitable and superior to other forms of adjudication in this case because the numerosity of the class renders joinder of individual plaintiffs impracticable. Second Amended Complaint ¶ 44(e). Plaintiffs also allege that identification of class members can be made based on readily available information and that the class size does not present unusual problems of judicial management or notice. *Id.* Additionally, Plaintiffs assert that because Defendants have refused to act to reopen the practice track as requested by Plaintiffs on grounds applicable to all class members, injunctive relief is proper against Defendants together with an award of damages. *Id.* ¶ 44(f).

## DISCUSSION

I. *Summary of Arguments on the Respective Motions.*

A. *Plaintiffs' Contentions in Support of Plaintiffs' Motion for Class Certification.*

Each of the 176 originally named Plaintiffs in this action is alleged to be a duly licensed physician who has practiced or is practicing emergency medicine in the United States but none of whom has completed or is attending a residency program in emergency medicine. Plaintiffs' Revised Memorandum of Law at 5. Plaintiffs claim that entry into and completion of a residency program in emergency medicine as the sole available means to qualify for the ABEM examination is burdensome and impractical. Plaintiffs' Reply Memorandum at 41. Each Plaintiff is alleged to have met the prior ABEM practice track requirements or is currently practicing emergency medicine so that each Plaintiff will, with the passage of time, meet the prior existing practice track requirements. *Id.* Plaintiffs, as of 1994 when the Second Amended Complaint was filed, estimated that approximately 14,000 emergency physicians were then, or would become in the future, eligible to take the ABEM certifi-

cation examination but for Defendants' allegedly unlawful closure of the practice track qualification criteria. *Id.* at 5. As noted, Plaintiffs believe that figure is now approximately 10,000. Plaintiffs contend that the facts of this case satisfy the criteria for certification of a class as required by Fed.R.Civ.P. 23(b)(3). Plaintiffs' Revised Memorandum at 25. Alternatively, Plaintiffs request certification pursuant to Fed.R.Civ.P. 23(b)(2). *Id.* at 34.

B. *Defendants' Contentions in Opposition to Plaintiffs' Motion for Class Certification and in Support of Defendants' Cross Motion to Dismiss.*

Defendants argue that although the proposed class is admittedly numerous in nature, the representative Plaintiffs do not present claims typical of the class and that, because of differences in the reasons for the Plaintiffs' inability to achieve ABEM eligibility under the former practice track, together with great variations in the potential damages incurred by class members, including representative Plaintiffs, alleged to result from the practice track closure, common issues of law or fact do not exist, or do not predominate over individual issues particularly in relationship to the elements of causality and damages. Defendants' Memorandum at 4. Finally, Defendants assert that a class action is not superior to other methods for resolving the merits of the instant action. *Id.*

On their cross motion to dismiss, Defendants contend, based on the allegations contained in the Second Amended Complaint as well as evidence developed in connection with Defendants' opposition to Plaintiffs' motion for class certification, that Plaintiffs lack antitrust standing requiring dismissal of the action. Defendants' Memorandum at 6. Specifically, Defendants argue that because Plaintiffs seek to reopen the practice track and obtain ABEM certification to obtain higher levels of compensation expected to result from gaining the ABEM certification which Plaintiffs ultimately seek, Plaintiffs fail to allege an antitrust injury, a prerequisite to a private federal antitrust action under Sections 4 and 16 of the Clayton Act. *Id.* Additionally, Defendants argue Plaintiffs lack antitrust standing because they are not "efficient enforcers" of the antitrust laws. *Id.* While Plaintiffs' motion for class certification preceded by several years Defendants' cross motion to dismiss, as standing "is essential to a [district] court's ability to entertain any claim," the analysis of the standing question raised by Defendants' cross motion "precedes any determination under Fed.R.Civ.P. 23." *Kent–Chojnicki v. Runyon,* 180 F.R.D. 237, 240 (W.D.N.Y.1998) (citing cases). Accordingly, the court will first address Defendants' cross motion.

II. *Defendants' Cross Motion to Dismiss for Lack of Antitrust Standing.*

At the outset, Plaintiffs contend that Defendants' cross motion should be rejected as this court has previously sustained Plaintiffs' Second Amended Complaint against Defendants' prior motions to dismiss for failure to state a claim, Plaintiffs' Reply Memorandum at 5, and that as such holdings represent the law of the case, Defendants' cross motion to dismiss should be denied. *Id.*

A. *Law of the Case.*

■ Under the law of the case doctrine, "courts generally refrain from reconsidering matters previously determined absent 'cogent' or 'compelling' reasons." *Baden v. Koch,* 799 F.2d 825, 828 (2nd Cir.1986). The doctrine is discretionary, however, and "does not constitute a limitation on the court's power." *United States v. Birney,* 686 F.2d 102, 107 (2nd Cir.1982).

A careful review of the procedural history of this case reveals that Defendants' standing argument, as a basis of dismissal, has not previously been presented to the court. In particular, in their initial motion to dismiss Plaintiffs' Amended Complaint, filed February 7, 1991, Defendants argued that the Amended Complaint was insufficient because it failed to adequately allege (i) the required degree of impact on interstate commerce flowing from Defendant ABEM's alleged unlawful practices, (ii) personal jurisdiction over defendants in that action,[8] (iii) the putative conspiracy, and (iv) a product and geographic market. Defendants' Memorandum of Law in Support of Motion to Dismiss Amended Complaint (Doc. No. 13) at 9–36; *Daniel I, supra,* at 917–27. In support of that motion to dismiss, Defendants contended, *inter alia,* that Dr. Daniel, then the sole plaintiff in the action, had suffered no antitrust injury based on a lack of notice of the scheduled closing of the ABEM practice track in 1988 citing in a footnote to *Brunswick Corp. v. Pueblo Bowl-O-Mat,* 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). Doc. No. 13 at 5. However, at that time, Defendants did not argue, as Defendants do on the instant cross motion, that Plaintiffs had failed to allege antitrust standing because the object of Dr. Daniel's lawsuit, as pleaded in the Amended Complaint, was to increase Dr. Daniel's income through an antitrust challenge to ABEM's closure of the practice track.

Defendants' first motion to dismiss the Second Amended Complaint was predicated on statute of limitations grounds and for failure to state a claim. *Daniel II* at

116. In that motion, Defendants also sought summary judgment based on immunity, lack of personal jurisdiction, and improper venue, *Daniel III* at 150; however, Defendants' challenge to the Second Amended Complaint at that time did not include assertion of the antitrust injury doctrine as a basis to find Plaintiffs lacked standing. Thus, as the specific question now raised by Defendants as a ground for dismissal on Defendants' cross motion, *i.e.,* a lack of Plaintiffs' antitrust standing, has been neither previously presented nor addressed by the court, the law of the case doctrine is inapplicable to Defendants' cross motion. Accordingly, the court turns to the merits of Defendants' cross motion.

B. *Plaintiffs' Failure to Allege an Antitrust Injury.*

 A court first, "must assess standing to sue based on the standing of the named plaintiff[s] and not upon the standing of identified class members." *Kent–Chojnicki, supra,* at 240 (citing cases). Standing is to be determined on the basis of the pleadings and all material allegations of the complaint must be accepted as true and construed in favor of the complaining party. *United States v. Vazquez,* 145 F.3d 74, 81 (2nd Cir.1998) (citing *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)). *See also Associated General Contractors of California v. California State Council of Carpenters,* 459 U.S. 519, 526, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983); *State of Connecticut v. Physicians Health Services,* 287 F.3d 110, 114 (2nd Cir.2002).[9] In applying the threshold

---

**8.** ABEM, Dr. Benson S. Munger, Executive Director of ABEM, and 18 officers and directors of ABEM.

**9.** Although Defendants' cross motion is brought pursuant to Fed.R.Civ.P 12(b)(1) (lack of subject matter jurisdiction), the court finds that the motion attacks Plaintiffs' stand-

ing based on whether Plaintiffs have "a sufficient stake in a judicial controversy to obtain judicial resolution of that controversy." *Sierra Club v. Morton,* 405 U.S. 727, 731–32, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). *See also Physicians Health Services, supra,* at 116–17 (distinguishing between a lack of standing

requirement of antitrust standing, a court may consider other relevant information in the record. *Antares Aircraft v. Federal Republic of Nigeria,* 948 F.2d 90, 96 (2d Cir.1991) (court may consider evidence outside pleadings on motion to dismiss for lack of standing), *vacated on other grounds,* 505 U.S. 1215, 112 S.Ct. 3020, 120 L.Ed.2d 892 (1992). See *Sanjuan v. American Board of Psychiatry and Neurology, Inc.,* 40 F.3d 247, 250 (7th Cir.1994) (considering on motion to dismiss antitrust claim not only the "skimpiness" of the complaint, but also plaintiffs' failure to provide information responsive to district judge's inquiry), *cert. denied,* 516 U.S. 1159, 116 S.Ct. 1044, 134 L.Ed.2d 191 (1996).

In this case, Plaintiffs allege that Defendants' "unlawful conspiracy in closing the practice track has precluded Plaintiffs and ... [other purported class members] from attaining ABEM certification or ABEM eligibility and thereby competing with ABEM certified and ABEM eligible physicians." Second Amended Complaint ¶ 8 (bracketed material added). Plaintiffs further claim that both they and "the class they represent have been injured by defendants' unlawful and anticompetitive acts ... [as] among other things, plaintiffs have been denied increases in remuneration .... *Id.* ¶ 13. Plaintiffs also charge that Defendants' unlawful conspiracy "restricted output and reduced competition in the market for ABEM certified and ABEM eligible emergency physicians to hospitals and others." *Id.* ¶ 92. According to Plaintiffs, "[t]he effect of [Defendants'] unlawful actions is to raise artificially the price of ABEM certified and ABEM eligible emergency physicians." *Id.* As a result, Plaintiffs assert Defendants violated Sections 1 and 2 of the Sherman Act and, pursuant to Clayton Act Sections 4 and 16, seek a determination that Defendants have violated the Sherman Act, trebling of any actual damages Plaintiffs have sustained, an injunction allowing them to take the ABEM certification examination if qualified under the ABEM practice track criteria, and attorneys fees and costs. *Id.* ¶¶ 126, 130, 135, X. Assuming the truth of Plaintiffs' allegations, Plaintiffs, who would have obtained ABEM certification but for closure of the practice track and, as suppliers of emergency medical services identical to those rendered by ABEM physicians and ABEM eligible physicians, state they are now entitled to treble the amounts of the extra compensation Plaintiffs have lost as a result of being unable to obtain ABEM certification based on eligibility for obtaining such certification under the practice track. *Id.* ¶ 135. However, applicable antitrust caselaw requires the court find that Plaintiffs lack standing to bring this lawsuit and that it should therefore be dismissed. "It is now well settled in order to have standing to prosecute private antitrust claims, plaintiffs must show more than that the defendants' conduct caused them injury." *Balaklaw v. Lovell,* 14 F.3d 793, 796 (2d Cir.1994) (citations omitted) (physician who lost exclusive service contract with hospital for anesthesiology service failed to establish antitrust standing). Rather, antitrust plaintiffs *"must plead and prove that the injury they have suffered derives from some anticompetitive*

---

based on absence of an injury in fact sufficient to create a case or controversy under Article III and other statements of the standing doctrine). Accordingly, the court treats Defendants' motion as one brought pursuant to Fed.R.Civ.P. 12(b)(6). *See Finkelstein v. Aetna Health Plans of New York, Inc.,* 1997 WL 419211, *6 (S.D.N.Y. July 25, 1997) (dismissing, upon remand for failure to permit plaintiff to replead, under Fed.R.Civ.P. 12(b)(6) amended complaint for failure to demonstrate antitrust standing), *aff'd,* 152 F.3d 917 (2d Cir.1998) (Table).

conduct and is the type the antitrust laws were intended to prevent." (Underlining added). *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438 (11th Cir.1991). *See also Balaklaw, supra*, at 796 ("Plaintiffs must prove *antitrust* injury, . . . injury of the type antitrust laws were intended to prevent . . . .") (quoting *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977)).

In *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc., supra*, plaintiffs claimed as damages additional profits they lost because defendant had unlawfully acquired several failing bowling alleys in plaintiffs' market which, but for defendant's acquisition, would have closed for lack of profitability. *Id.* at 481, 97 S.Ct. 690. The Supreme Court found the essence of plaintiffs' claim was that they could not obtain "profits they would have realized had competition been reduced." *Id.* at 448, 97 S.Ct. 690. Because, as the Supreme Court stated, the "antitrust laws . . . were enacted for the 'protection of *competition, not competitors,'* *Brown Shoe Co. v. United States*, 370 U.S. at 320, 82 S.Ct. 1502 . . . [i]t is inimical to the purposes of these laws to award damages for the type of injury [the loss of windfall profits] claimed here." *Id.* (italics in original) (bracketed material added). In the Court's view, plaintiffs' alleged losses of such profits flowing to plaintiffs from the expected reduction of competition would have resulted from the challenged merger between defendant and the prior owners of the failing bowling alleys regardless of whether defendant was financially capable of taking predatory actions against plaintiffs or had obtained new financing on their own thereby preserving their presence on the market. *Id.* at 487, 97 S.Ct. 690. Because plaintiffs' asserted losses did not result from any antitrust misconduct by defendant, but, rather, from the prospect of continued competition from the merged bowling alleys, the Court found that plaintiffs' injury "was not of 'the type that the statute [Section 4 of the Clayton Act] was intended to forestall.' " *Id.* (internal citation omitted). Thus, the Court stated that a Section 4 plaintiff

> must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be "the type of loss that the claimed violations . . . would be likely to cause." *Zenith Radio Corp. v. Hazeltine Research*, 395 U.S. at 125, 89 S.Ct. 1562.

*Brunswick Corp., supra*, at 489, 97 S.Ct. 690.

Because in *Brunswick* plaintiffs could not establish that their asserted injury and damage—loss of extra profits based on reduced competition—was of the type antitrust laws were intended to protect or that such losses flowed from business actions rendered illegal by operation of the antitrust laws, plaintiffs' damage claim was held not cognizable under Section 4. 370 U.S. at 488, 82 S.Ct. 1432. As the Court stated: "[W]hile respondents' loss occurred 'by reason of' the unlawful acquisitions, it did not occur 'by reason of' that [predatory action against plaintiffs] which made the acquisition unlawful." *Id.* at 488, 82 S.Ct. 1432 (bracketed material added). Thus, because plaintiffs sought to recoup profits lost through increased, albeit unwanted competition to plaintiff, competition, the Court found the injury one not proper for redress under the antitrust laws. The requirement that to have standing, an antitrust plaintiff should have incurred an antitrust injury was later ex-

tended to nonmerger cases. *See J. Truett Payne Co. v. Chrysler Motors Corp.,* 451 U.S. 557, 562, 101 S.Ct. 1923, 68 L.Ed.2d 442 (1981) (for any antitrust violations "a plaintiff must make some showing of an actual injury attributable to something the antitrust laws were designed to prevent.") In *J. Truett Payne Co., supra,* the Court held a Robinson–Patman Act plaintiff was "not excused from its burden of proving an antitrust injury." 451 U.S. at 568, 101 S.Ct. 1923.

In *Matsushita Electric Ind. Co. v. Zenith Radio,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), the Supreme Court found that plaintiffs' claim for damages based on an alleged conspiracy to charge higher than competitive prices was barred under the Sherman Act because, as defendants' competitors, plaintiffs "[stood] to gain from any conspiracy to raise the market price [for the relevant product]." *Matsushita, supra* at 583, 106 S.Ct. 1348, (citing *Brunswick, supra*) (bracketed material added). Nor, as the Court stated, can a competitor sue "to recover for a conspiracy to impose nonprice restraints that have the effect of either raising market price or limiting output ... [because] [s]uch restrictions, though harmful to competition, actually *benefit* competitors by making supracompetitive pricing more attractive [to such competitors]." *Id.* (italics in original) (bracketed material added). Because in *Matsushita* plaintiffs, as defendants' competitors in the U.S. market and as potential competitors of defendants in defendants' Japanese market, sought to challenge, in the Court's view, conduct beneficial to them as competitors, the Court found plaintiffs had no "cognizable claim against [defendants] for antitrust damages." *Id.* Thus, the Court held that as defendants' competitors seeking damages pursuant to Clayton Act Section 4, plaintiffs could not challenge under the antitrust laws noncompetitive arrange-

ments that benefitted them as competitors. The requirement that an antitrust plaintiff allege it suffered a cognizable antitrust injury caused by a defendant as prerequisite to a request for injunctive relief pursuant to Section 16 of the Clayton Act was established in *Cargill, Inc. v. Monfort of Colorado,* 479 U.S. 104, 113, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986).

The antitrust standing requirement for private actions brought under Sections 4 or 16 of the Clayton Act seeks to "avoid overdeterrence resulting from the use of the somewhat draconian treble damage award," available for Sherman Act violations. *Todorov, supra,* at 1449. "[B]y restricting the availability of private antitrust actions to certain parties, we ensure that suits inapposite to the goals of the antitrust laws are not litigated and that persons operating in the market do not restrict procompetitive behavior because of a fear of antitrust liability." *Id.*

The requirement of antitrust injury and standing, as a prerequisite to suit under Section 4 and 16 of the Clayton Act, has been extended to plaintiffs who as competitors in the market seek a professional credential that will enable them to charge higher prices for their services in that market, and a request for such relief in a federal antitrust complaint negates the existence of an antitrust injury and standing requiring dismissal of the complaint. In *Sanjuan, supra,* the Seventh Circuit held plaintiffs, psychiatrists who failed the oral portion of defendant's board certification examination, lacked antitrust standing where damages sought allegedly resulted from plaintiffs' inability to charge higher fees without such certification. As the court stated, "the claim that a practice reduces (particular) producers' incomes has nothing to do with the antitrust laws, which are designed to drive producers' prices down rather than up." *Sanjuan,*

*supra,* at 251 (citing cases). "Plaintiffs, who want to obtain a credential that will help them charge higher prices, have pleaded themselves out of court on the[ir] antitrust claim." *Id.* at 252. *Sanjuan* thus extends *Brunswick* and *Matsushita* to competitors who challenge the granting of a competitive advantage to a competitor in order to increase the price of their services, a purpose not protected by the Sherman Act.

Here, Plaintiffs do not claim that they were prevented from practicing emergency medicine; rather, Plaintiffs allege that because of the anticompetitive closure of the practice track they were unable to obtain the ABEM certification that would permit them to earn higher incomes as ABEM certified emergency physicians. As such, Plaintiffs' alleged damages flow directly from Plaintiffs' consequent inability to earn and benefit from a professional credential, ABEM certification, with which they expect to obtain greater compensation at a level resulting from the anticompetitive conduct they seek to condemn; therefore, the deprivation of such an economic advantage, *i.e.,* the ability to raise prices because of a competitor's noncompetitive conduct, to a competitor or prospective competitor, is an economic consequence to which the antitrust laws are indifferent. *Matsushita, supra; Brunswick, supra.*

Applying the requirement that a Clayton Act Sections 4 or 16 plaintiff allege a cognizable antitrust injury, courts have consistently rejected antitrust claims based on lack of antitrust standing including cases where physicians, as antitrust plaintiffs, have sought to confer economic advantage, in addition to board certifications, upon themselves by attacking business practices by competitors and purchasers of their services having the effect of excluding them from the market. *Ba-*

*laklaw, supra* (plaintiff anesthesiologist lacked antitrust standing for action to cancel award of exclusive service contract by hospital to a competitor); *Todorov, supra* (radiologist who sought radiology department privileges to administer and read CT head scans in order to share in supercompetitive fees charged by staff radiologists for same service lacked antitrust standing as plaintiff sought to "reap" that which the competing CT scan radiologists enjoyed); *Salamon v. Our Lady of Victory Hospital,* 1999 WL 955513 *2 (W.D.N.Y. Oct. 5, 1999) (plaintiff physician alleging restraint of trade based on defendant's exclusion from referrals for her medical services lacked antitrust standing); *Korshin v. Benedictine Hospital,* 34 F.Supp.2d 133, 138 (N.D.N.Y.1999) (physician who lost exclusive services contract to provide anesthesiology services to hospital failed to allege antitrust injury); *Ezekwo v. American Board of Internal Medicine,* 18 F.Supp.2d 271, 277 (S.D.N.Y.1998) (physician seeking hospital admission privileges and participation in an HMO failed to allege sufficient facts demonstrating injury to competition and market area and thus no antitrust injury sufficient for standing), *aff'd,* 173 F.3d 844 (2nd Cir. 1999); *Ginzburg v. Memorial Healthcare Systems, Inc.,* 993 F.Supp. 998 (S.D.Tex. 1997) (physician's alleged inability to successfully practice medicine at defendant hospital, based on defendants' refusal to refer patients, declining to provide cross-coverage and black-listing, failed to allege an antitrust injury); *Finkelstein, supra,* at *5 (alleged coercive provisions imposed by combination of hospitals and insurance carrier upon plaintiff-physicians' decision making authority in care of patient-insureds failed to allege an antitrust injury). *See also Appraiser's Coalition v. Appraisal Institute,* 1999 WL 89663 (N.D.Ill. Feb. 12,1999) (real estate appraisers seeking special qualification designation from de-

fendant trade organization made up of competing appraisers failed to allege antitrust injury).

A fair reading of the Second Amended Complaint, Plaintiffs' Revised Memorandum, Plaintiffs' Reply Memorandum, and consideration of discovery related to Plaintiffs' class certification motion demonstrates that Plaintiffs have failed to plead any cognizable antitrust injury sufficient to confer antitrust standing under either Section 4 or 16 of the Clayton Act. Specifically, the Second Amended Complaint alleges that Defendants' conspiracy caused them to be denied "increases in remuneration" based on their inability to obtain ABEM certification. Second Amended Complaint ¶ 13. Further, according to Plaintiffs, they and members of the alleged class "receive substantially less remuneration than ABEM certified physicians (in an average amount of no less than $50,000 annually)." Second Amended Complaint ¶ 104. Additionally, Plaintiffs claim the loss of "increases in remuneration for which they otherwise would be qualified" if they were able to sit for and pass the ABEM certification examination through the practice track. *Id.* ¶ ¶ 88(a), (e), (g), (k); 109.

Plaintiffs' legal argument reinforces Plaintiffs' compensation enhancing purposes. Specifically, in connection with the allegations in support of class certification, Plaintiffs include among the common issues Plaintiffs assert exist with respect to each proposed class member

"● The purpose and effect of defendants' conspiracy to restrain competition *and increase the economic and other professional benefits associated with ABEM certification;*

\* \* \* \* \* \*

● The artificial elevation *of the prices paid by the public for the services of ABEM-certified and ABEM-eligible emergency physicians caused by defendants' actions;*

● The *artificial reduction in the earnings of plaintiffs and proposed class caused by defendants' actions in unlawfully withholding eligibility for ABEM certification from plaintiffs and the proposed class."*

Plaintiffs' Revised Memorandum at 19 (emphasis added).

Further, in contending that both Plaintiffs and members of the proposed class suffered an injury in fact caused by the Defendants' alleged antitrust violations, Plaintiffs stated that Defendants' "conspiracy *has prevented all Plaintiffs from obtaining the higher salaries* that ABEM certified and ABEM eligible emergency physicians command ...." Plaintiffs' Memorandum at 26 (Doc. No. 70) (underlining added). Such allegations do not describe "an injury the antitrust laws were intended to prevent" and do not "flow[ ] from that which makes defendants' acts unlawful." *Brunswick, supra,* at 489, 97 S.Ct. 690. *See Balaklaw, supra; Sanjuan, supra; Todorov, supra.*

Additionally, the testimony of individual Plaintiffs obtained through discovery manifests Plaintiffs' primary objective in this lawsuit as that of increasing their income based on obtaining ABEM certification. For example, Dr. Daniel, the lead Plaintiff, acknowledged that obtaining ABEM certification would enable him to "command a higher hourly rate" by achieving "parity" with ABEM certified physicians who receive higher compensation. Daniel Deposition at 135–36, Appendix to Defendants' Memorandum of Law Vol. II, Exhibit K.[10]

10. Unless indicated otherwise "Dep. at ___" refers to deposition testimony of individual

Plaintiffs or their expert contained in Volumes II (Keil -Wayne) or III (Alexander—

Dr. Timmons, another Plaintiff, testified that as a result of receiving ABEM certification in 1996, upon qualifying under the special track available to ABIM members with academic credentials, he successfully negotiated a "significant" salary increase. Timmons Dep. at 11. Dr. Timmons also stated that he is seeking $279,000 in damages for the period 1990–1994 representing the higher compensation he believes he would have earned had he then held ABEM certification during that period. Timmons Dep. at 51.

Further confirmation that such enhanced compensation upon achieving ABEM board certification based on practice track eligibility, as the goal of the instant litigation, is provided by other Plaintiffs. For example, Plaintiff Dr. Ian Cummings testified that if he were ABEM certified, he expected to be paid more by his group practice organization. Cummings Dep. at 44, 51, 70. Dr. K. Michael Keil, another Plaintiff, testified that with ABEM certification, his group practice organization for emergency services could have placed him at a hospital which paid $10 more per hour than his current hourly rate. Keil Dep. at 201. Plaintiff Dr. Phillip LaStella testified that with ABEM certification it was conceivable that he could earn more than his present income of about $500,000 per year. LaStella Dep. at 109. Dr. Douglas Middleton, another Plaintiff, testified that he is confident his annual income would have been as much as $100,000 to $200,000 higher, depending on the hospital at which he had been hired, if he then held ABEM certification. Middleton Dep. at 51–55. According to answers to Defendants' interrogatories, Dr. Muran's compensation as an emergency physician without ABEM certification was be-

tween $70,000 to $100,000 per year lower than it would have been with ABEM certification. Muran Answer to Interrogatory No. 17(a) dated May 28, 1999, Vol. III, Exh. K to Appendix to Defendants' Memorandum of Law in Opposition. Plaintiff Dr. Kurt Papenfus estimated, without particulars, his annual compensation loss from his lack of ABEM certification to be about $1 million over a 10 year period. Papenfus Answer to Defendants' Interrogatory No. 17(a) dated July 10, 1999. *Id.*

Plaintiffs' expert, Dennis W. Carlton, Ph.D., who holds a doctorate in economics from the University of Chicago, in the course of deposition testimony explaining the rationale for his multiple regression analysis to support Plaintiffs' request for class certification, discussed in Section III, *infra*, also confirmed that Plaintiffs' ultimate objective in bringing this lawsuit is to benefit themselves economically through increased compensation by obtaining ABEM certification:

Q. Isn't it true that the plaintiffs in this case are seeking a credential that will help them charge higher prices?

A. I think plaintiffs are seeking a credential to which they believe they're entitled by virtue of their qualifications that would be reflected in the marketplace *as a higher price than they are currently earning.*

Q. In other words, they believe that if board certified, *they'll be able to make more money?*

A. *Correct.*

\* \* \* \* \* \*

Q. And you believe that if the members of the class do get the ABEM credential that they would then be *able to charge*

Gross), Exhibit K of Appendix to Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification and In

Support of Defendant's Cross–Motion to Dismiss for Lack of Standing (Doc. Nos.773–775) filed under seal.

*higher prices* than they're currently charging for their services?

A. *Yes,* I believe that.

Deposition of Dennis W. Carlton, Ph.D., Carlton Dep. at 334–36 (underlining added). "Indeed, if certification did not typically result in higher wages, it is not clear why individuals [including Plaintiffs] would have an incentive to become certified." Reply Affidavit of Dennis W. Carlton, Ph. D., dated July 12, 2002 (Doc. No. 798) ("Carlton Reply Affidavit") ¶ 14 (bracketed material added).

Thus, based on the allegations presented in the Second Amended Complaint, Plaintiffs' supporting legal memoranda, and the record on Plaintiffs' motion, through the relief Plaintiffs request, they seek to qualify for ABEM certification and damages for being prevented from obtaining ABEM certification, for the purpose of obtaining higher prices for their services in the market for ABEM physicians and ABEM eligible physicians and, but for the alleged wrongful closure of the practice track, damages representing the loss of such higher income as they have pleaded. As prospective competitors of ABEM physicians or ABEM eligible physicians who seek higher income based on ABEM certification, Plaintiffs' requested relief is not recognized as a permissible objective under the antitrust laws, and, as such, Plaintiffs lack standing. *Sanjuan, supra; Todorov, supra.*

Plaintiffs advance several grounds to defeat Defendants' cross motion. First, Plaintiffs contend that the requirement of antitrust injury as an element of standing should be resolved at trial. Plaintiffs' Reply Memorandum at 7–9.` However, there is no merit to this contention as courts frequently dismiss complaints in antitrust actions prior to trial for insufficient allegations of antitrust injury and standing. *See Sanjuan, supra* (dismissing complaint for lack of standing based on absence of showing plaintiff had suffered antitrust injury affirmed); *Korshin, supra* (same); *Salamon, supra* (same) *Finkelstein, supra* (same). *See also Balaklaw, supra* (granting summary judgment against plaintiff who failed to demonstrate antitrust injury and therefore lacked standing); *Todorov, supra* (same); *The Appraisers Coalition, supra* (same). *Cf. Matsushita, supra* (recognizing on motion for summary judgment unavailability of Sherman Act remedies based on suit by plaintiff competitors challenging conspiracy to raise prices in defendant competitors' domestic market). As noted, standing issues are to be determined based on the material allegations in the complaint. *Vasquez, supra; Finkelstein, supra.* Hence, it is proper to determine Plaintiffs' antitrust standing at this stage of the proceedings.

Second, Plaintiffs argue that sellers and producers including "injured competitors" against whom the antitrust misconduct was directed have been held to have standing to enforce antitrust laws. Plaintiffs' Reply Memorandum at 10 (citing cases). Plaintiffs' cited authorities do not support such a broad generalization and are, in any event, inapposite. For example, in *Full Draw Productions v. Easton Sports, Inc.,* 182 F.3d 745 (10th Cir.1999) trade show operators' claims of group boycott by suppliers were found to establish standing based on the rule that group boycott claims do not require that plaintiffs and defendant competitors operate at the same market level. *Full Draw, supra,* at 745 (citing cases). In *Crimpers Promotions, Inc. v. Home Box Office, Inc.,* 724 F.2d 290 (2d Cir.1983), plaintiff had standing to challenge defendants' effort to induce boycott of plaintiff's trade show which was sponsored by plaintiff to increase competition against defendant for cable TV programming. *Crimpers Pro-*

*motions, supra,* at 294. *Radovich v. National Football League,* 352 U.S. 445, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957) also involved a boycott claim based on an alleged blacklisting of plaintiff, a professional football player. In *Municipal Utilities Board v. Alabama Power Co.,* 934 F.2d 1493 (11th Cir.1991) the court found municipal electric suppliers had standing to challenge a state sponsored retail market allocation scheme to benefit retail electrical cooperatives which competed with plaintiffs. Here, the Second Amended Complaint contains no group boycott or market division allegations. As Plaintiffs do not allege a group boycott or an unlawful market allocation scheme among competitors, the caselaw upon which Plaintiffs rely fails to establish that Plaintiffs enjoy antitrust standing.[11] Moreover, unlike the instant matter, in none of these cases did plaintiffs seek to gain an economic advantage the would enable them to charge higher prices.

Nor does Plaintiffs' reliance on *Blue Shield of Virginia v. McCready,* 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982) and *Calderone Enter. Corp. v. United Artists Theatre Circuit, Inc.,* 454 F.2d 1292 (2d Cir.1971), Plaintiffs' Reply Memorandum at 14, 15–16, support Plaintiffs' motion. In *McCready,* the Supreme Court upheld antitrust standing for a subscriber of health care insurers' coverage challenging the insurer's arbitrary refusal to pay for a licensed psychologist's therapy services while allowing reimbursement for psychotherapy services by psychiatrists. As such, the Court found plaintiff's standing depended on a finding of direct financial harm to plaintiff deriving from her position as a consumer not as a supplier of psychotherapy services but which was the necessary result of the conspiracy to withhold payments to the psychologists as competitors of the psychiatrists. *McCready,* 457 U.S. at 483–84, 102 S.Ct. 2540. No similar direct harm to Plaintiffs following from an arbitrary restriction on competition is alleged here, rather, Plaintiffs seek to raise the price for their services as they gain professional competitive parity with ABEM physicians and ABEM eligible physicians. As such, *McCready* provides no

---

**11.** Despite Plaintiffs' contention at oral argument, the court finds Plaintiffs have not alleged a group boycott. To be actionable under the antitrust laws, boycotts or concerted refusals to deal "generally involve[ ] joint efforts by a firm or firms to disadvantage *competitors* by 'either directly denying or persuading or coercing suppliers or customers to deny relationships *the competitors* need in the competitive struggle.'" *Northwest Wholesale Stationers, Inc. v. Pacific Stationery and Printing Co.,* 472 U.S. 284, 292, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985) (citing authorities and cases) (underlining added). However, Plaintiffs have alleged that "[d]efendants' unlawful conspiracy in closing the practice track has *precluded the plaintiffs ... from attaining ABEM certification or ABEM eligibility and thereby competing with ABEM eligible physicians.*" Second Amended Complaint ¶ 8 (underlining added). Plaintiffs construe their allegations in a similar manner. "In the present case, plaintiffs have clearly alleged that there is a market for ABEM— certified emergency—medicine physicians to which they have been *denied access.*" Plaintiffs' Reply at 11 (underlying added). It is unclear how Plaintiffs can be considered competitors in the relevant market if they allege the conspiracy deprives them of that status. Significantly, in each case relied on by Plaintiffs, the plaintiff was an established competitor of defendants. However, assuming for the sake of analysis that Plaintiffs have asserted a group boycott because, as discussed, Plaintiffs seek to benefit from the same credential that will enable them to realize higher compensation—and thus costs to consumers—their inability to demonstrate a procompetitive effect by lowering prices through greater competition, resulting from greater access to the market, defeats antitrust standing. Even allowing for application of the principles of liberal construction and alternate theories of pleading, the court fails to see how Plaintiffs can be found to have asserted group boycott claims sufficient to establish antitrust standing on that basis.

support to Plaintiffs' efforts to establish antitrust injury and standing.

In *Calderone, supra,* a landlord sued for decreased rental income caused by defendants' conspiracy to force the showing of "inferior" films at plaintiffs' movie houses thus reducing the landlord's rental revenue. *Calderone,* 454 F.2d at 1294. Applying Second Circuit precedent, the court in *Calderone* found plaintiff lacked standing under Section 4 of the Clayton Act as plaintiff was not within the target area of the antitrust conspiracy, *"i.e.,* a person against whom the conspiracy was aimed, such as a competitor of the persons sued." *Id.* at 1295. However, in *Crimpers, supra,* the Second Circuit held that following holdings of the Supreme Court subsequent to *Calderone,* as to the scope of Section 4 of the Clayton Act, "courts in this circuit should start their analysis of standing under Section 4 with the Supreme Court opinions rather than engage in extensive parsing of *Billy Baxter* [*Inc. v. Coca–Cola Co.* 431 F.2d 183 (2d Cir.1970)] and *Calderone.*" *Id.* (citing authorities criticizing the "target area approach" to determinations of antitrust standing applied in *Billy Baxter* and *Calderone* ). *Crimpers, supra,* at 292 (Friendly, J.) (bracketed material added). "[C]ourts of this circuit ... are compelled, to follow approaches adumbrated by the Supreme Court ... without concern whether the results are consistent with language in earlier Second Circuit cases." *Id.* Accordingly, Plaintiffs' assertion that because Defendants' alleged conspiracy was directed at them, even if true, is in itself insufficient to establish standing unless Plaintiffs' allegations also comport with more recent and relevant Supreme Court holdings, discussed *supra,* propounding the prerequisite of antitrust standing for Section 4 cases. *See Balaklaw, supra* (analyzing antitrust standing issue as to physician's boycott and concerted refusals to deal claims based on Su-

preme Court cases without reference to prior Second Circuit standing caselaw considering whether antitrust plaintiff was 'target' of alleged antitrust conspiracy). Thus, *Calderone's* application of the 'target area' test for antitrust standing provides no support to Plaintiffs as such approach is inconsistent with the Second Circuit's later decision in *Crimpers, supra.*

Third, Plaintiffs seek to distinguish *Sanjuan* on the basis that plaintiffs in that case, unlike Plaintiffs, failed to allege an unlawful exercise of market power, a reduction in output, or exclusion from competition in that, in *Sanjuan,* plaintiffs, who continued to practice in their specialty, were not precluded from taking defendant's certification examination, rather, they were unable to pass it. Plaintiffs' Reply Memorandum at 10–11. Plaintiffs further argue that this court has previously sustained the Amended Complaint and Second Amended Complaint against Defendants' attempts to dismiss. *Id.* at 11 (citing *Daniel I, supra* and *Daniel II, supra* ). However, as explained in connection with the court's consideration of Plaintiffs' argument based on the law of the case doctrine, Discussion, *supra,* at 13–14, the court has not previously been presented with the specific ground for dismissal now interposed by Defendants, *i.e.,* that Plaintiffs lack standing based on a failure to allege a cognizable antitrust injury sufficient to permit recovery or injunctive relief pursuant to Sections 4 and 16 of the Clayton Act. Thus, while the court has sustained the Amended and Second Amended Complaint against Defendants' earlier motions to dismiss on grounds other than asserted here by Defendants, it does not follow that Plaintiffs can avoid scrutiny for failing to allege the existence of any cognizable antitrust injury and standing.

Likewise unavailing is Plaintiffs' effort to distinguish *Sanjuan* on the ground that

because in *Sanjuan* plaintiffs were found by the court to be defendants' competitors the court's finding that plaintiffs lacked antitrust standing is inapplicable to Plaintiffs' allegations. Plaintiffs' Reply Memorandum at 11. Particularly, Plaintiffs contend that they are not yet in competition with ABEM certified or eligible physicians because they have not gained the opportunity to obtain ABEM certification (by qualifying through the practice track to take the ABEM examination), and thus cannot be said to compete with ABEM certified or eligible physicians. *Id.* at 11–12. Plaintiffs reason that because Plaintiffs are not competitors who challenge an anticompetitive practice that if engaged in by them will allow them to charge higher prices, the reasoning of *Sanjuan*—holding that competitors who challenge anticompetitive practices beneficial to such competitors lack antitrust standing—as to the requirements of antitrust injury and standing is inapplicable to this action. *Id.*

Specifically, *Sanjuan* holds that a competitor who "seeks to gain a credential that will help them charge higher prices" as competitors who enjoy the credential, "have pleaded themselves out of court on the antitrust claim." *Sanjuan, supra,* at 251. Assuming, *arguendo,* Plaintiffs in fact do not compete in the relevant market, *i.e.,* the market for ABEM or ABEM eligible physicians, because they are unable to qualify for the ABEM certifying examination, it is undisputed that by this action Plaintiffs seek to become such competitors through a request for equitable relief compelling reopening the practice track to enable Plaintiffs to qualify to take the ABEM certification examination and thereby achieve ABEM certification. Therefore, Plaintiffs' use of the antitrust laws to acquire a credential that, according to the allegations in the Second Amended Complaint, has as a primary objective giving Plaintiffs the capacity to enter the relevant market so they may substantially increase their compensation by charging more for their services upon obtaining ABEM certification thereby matching the compensation earned by their future competitors, equally fails to allege an antitrust injury and deprives Plaintiffs of standing under Clayton Act Sections 4 and 16. Plaintiffs offer no reasoned basis to distinguish, for purposes of the relevant standing analysis, between competitors who possess an income enhancing credential and litigants who seek access to that credential in order to compete with those who have it. Thus, the court finds that Plaintiffs' status as competitors of ABEM or ABEM eligible physicians or as persons seeking to become such competitors is an irrelevant distinction to whether they have or can allege an antitrust injury. In either case, because their goal is to gain the credential that will cause noncompetitive prices to inure to Plaintiffs' benefit, their claim for relief falls outside the ambit of antitrust protection and they lack standing under the Clayton Act. As such, Plaintiffs' effort to avoid the holding in *Sanjuan* on this basis fails.

Equally unpersuasive is Plaintiffs' argument that when more than one competitor or potential competitor seeks, but is refused an opportunity to obtain, certification, such denial of access to the relevant market "evinces a reduction in competition in the market in general," thereby providing sufficient nexus to one of the fundamental purposes of the antitrust laws sufficient to create standing. Plaintiffs' Reply Memorandum at 14. The requirement for standing that an antitrust plaintiff, or group of plaintiffs, sufficiently allege an antitrust injury does not depend on an allegation that the target conduct operates to reduce competition. Rather, the requirement of an antitrust injury turns not on the illegality of the defendant's con-

duct—indeed, such illegality is presupposed—but on the fact that a plaintiff seeks to engage in or benefit from the same activity. *See Matsushita, supra,* at 583, 106 S.Ct. 1348 (challenged conspiracy to charge higher prices violates antitrust law but does not injure plaintiffs because as defendant's competitors, plaintiffs "stand to gain from any conspiracy to raise the market price . . . ."); *Brunswick, supra,* at 489, 97 S.Ct. 690 ("the injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation."); *Todorov, supra* at 1453 (plaintiff's "damages are premised on his ability to profit while consumers paid an artificially inflated price."). Thus, as the alleged anticompetitive conduct alleged by Plaintiff—arbitrary closure of the ABEM practice track—operates to benefit competitors (including prospective competitors) who supply the relevant services in the market, Plaintiffs have no standing to challenge it. *Matsushita,* 475 U.S. at 583, 106 S.Ct. 1348.

Finally, Plaintiffs attempt to avoid the holding in *Sanjuan* that the antitrust laws may not be invoked by a supplier to obtain a credential by which to increase the supplier's income. Specifically, Plaintiff argue they will benefit consumers and competitors because, if successful, Plaintiffs' lawsuit will, over time, effect a lowering of the price of emergency medical services, provided by ABEM certified and ABEM eligible physicians, resulting from "increased competition once the class members join the ABEM-eligible pool." Plaintiffs' Reply Memorandum at 12–13. This contention is without merit for several reasons. First, Plaintiffs' theory that reopening the ABEM practice track will eventually cause a reduction in the price of ABEM physician and eligible physician services through the presence of large numbers of additional ABEM or ABEM eligible physicians, is an expectation not advanced in the Second Amended Complaint nor supported by the record. While the Second Amended Complaint repeatedly charges that Defendants' conspiracy created and maintained artificially high prices for ABEM physicians' and ABEM eligible physicians' services, *see e.g.,* Second Amended Complaint ¶¶ 14, 16, 20(a), 21(a), 57, 82, 87, 88(h), 92, 95, 96 and 104, no where do Plaintiffs claim that a reopening of the practice track will result in lower prices to consumers of such services either in the short term or thereafter. Accordingly, there is no allegation, which, if its truth were assumed, supports Plaintiffs' contention that Plaintiffs' cause of action has an objective consistent with the purposes of the antitrust laws. *See Physicians Health Services, supra* (standing determined based on pleadings assuming the truth of the allegations); *Vasquez, supra* (same).

At oral argument, Plaintiffs contended that the court should reasonably infer from Plaintiffs' allegations of noncompetitively higher prices generated by the conspiracy that upon reopening of the practice track, the resulting additional ABEM certified physicians in the market will cause prices to decline. However, given the plethora of allegations asserting, as discussed, Discussion, *supra,* at 21–25, that Plaintiffs' objective is to advance their own economic interest by obtaining access to the same higher levels of compensation created by the charged conspiracy, the notion that Plaintiffs will also succeed in lowering such compensation to their economic detriment is an inference that is neither reasonable nor plausible. Simply put, Plaintiffs have no natural economic self-interest in achieving such a result. Whether given the economic complexities of the health care services market, including a high degree of government regulation and financial involvement, the normal laws of supply and demand can even be applied requires so-

phisticated economic analysis that is neither asserted nor presaged by anything within the four corners of the Second Amended Complaint drawing any inferences in Plaintiffs' favor. Significantly, Dr. Carlton had no opinion on the question whether prices to consumers of emergency medical services were likely to fall if Plaintiffs succeeded in the litigation. Carlton Dep. at 316–17. As such, the court finds Plaintiffs' assertion that their allegations can be read to reasonably infer that lower prices for emergency medical services will result from their lawsuit, if successful, to be without foundation in the pleadings and record, and an unsubstantiated afterthought.

Even if Plaintiffs had alleged that allowing their entry into the market for ABEM and ABEM eligible physicians resulting from this litigation would cause the price for such services to decline, a similar asserted basis for the existence of an antitrust injury and standing was rejected in *Todorov v. DCH Healthcare Auth., supra.* In *Todorov,* a neurologist to whom defendant had granted staff privileges to practice neurology, later requested additional privileges to perform CT scans of a patient's head. Plaintiff sought, but defendant refused to grant, radiology privileges so he could charge for the interpretation of CT scans instead of the defendant radiologists who had been conducting the scans and performing this diagnostic service for a fee. *Todorov, supra,* at 1442. Finding plaintiff had suffered no antitrust injury, the court upheld the grant of summary judgment against plaintiff because it found that plaintiff sought to share in the "supercompetitive profits" enjoyed by the radiologists as a result of the alleged anticompetitive pricing imposed by the radiologists on the patients and their insurers. *Id.* at 1453–54. As such, the court in *Todorov,* stated that plaintiff's "alleged damages equal the profits he would have garnered

had he been able to share a part of [defendant] radiologists' supercompetitive, or monopoly, profits. This is not antitrust injury." *Id.* at 1453 (bracketed material added).

As relevant to Plaintiffs' contention that they seek to reduce prices by increasing supply, the court in *Todorov* also considered whether the possibility that by seeking entry to the relevant market plaintiff could, through engendering greater competition with the radiologists, effect an eventual reduction in the cost of interpreting CT head scans as a result of his lawsuit and establish standing. *Todorov, supra,* at 1454. The court rejected this assertion because plaintiff's ability to realize a profit depended on maintaining a noncompetitive higher price and as plaintiff could realize no profit at a competitively established market price, the court found that plaintiff's only economic interest was to seek entry into the market to share in the alleged supercompetitive pricing of his would-be competitors. *Id.* at 1454. Further, in *Todorov* as in the instant case, plaintiff did not allege that his purpose was to drive down prices for the services at issue. *Id.* Likewise here, even considering Plaintiffs merely seek entry into the market for ABEM physicians' and ABEM eligible physicians' services and further positing that such market access through ABEM certification under the practice track could eventually reduce prices for such services as actual or prospective competitors and suppliers of such services, Plaintiffs' immediate and long term economic interest lies only in keeping the price of these services artificially elevated so that they may use ABEM certification to obtain the extra degree of compensation they specifically allege they will receive upon obtaining such certification. Thus, as in *Sanjuan* and *Todorov,* because Plaintiffs allege no

injury the antitrust laws are intended to prevent, Plaintiffs lack standing.[12]

Plaintiffs further argue that the large number of potential new entrants into the relevant market, that Plaintiffs believe will be the result of their lawsuit if successful, also distinguishes this case from those relied upon by Defendants. Plaintiffs' Reply Memorandum at 12. However, even it is supposed that a broader impact on competitiveness within the relevant market will result from Plaintiffs' entry into the relevant market, the economic interests of Plaintiffs upon which this action is based remains one that has been rejected by the courts. Discussion, *supra*, 19–26. While entry of large numbers of ABEM physicians and ABEM eligible physicians may result in greater competition among suppliers of emergency medical services, including a possible future reduction in the price of the emergency medical services rendered by suppliers, such potentialities do not avoid a finding that where present or prospective competitors seek to reap the benefits of supercompetitive pricing conferred by the alleged anticompetitive scheme, antitrust injury and standing are not present. *See Matsushita, supra*, at 583, 106 S.Ct. 1348 (potential competitors' attack on nonprice restrictions imposed by defendant cartel that increase price or limit output lacks antitrust standing); *Todorov, supra*, at 1453 (entry into market by potential competitor which may produce lower prices does not negate fact that plaintiff's damages represent share of lost "profits" based on supercompetitive prices

imposed by defendant competitors thereby defeating antitrust standing for plaintiff).

Plaintiffs' request for equitable relief presents the same deficiency, in demonstrating the existence of antitrust standing, as does Plaintiffs' request for damages, because removing the market entry barriers alleged against Defendants at issue to achieve greater supply and "unrestrained competition," albeit an "altruistic" motive, is not Plaintiffs' primary objective. *Todorov, supra*, at 1454. Rather, as discussed, Plaintiffs seek ABEM certification as a device that will enable them to gain the benefits of supercompetitive pricing presently enjoyed by ABEM physicians and ABEM eligible physicians, a goal that disqualifies them from using the equity power of the court to obtain market access. *Todorov, supra*, at 1453–54. As such, the court finds none of Plaintiffs' contentions overcome Defendants' grounds for dismissal for lack of antitrust standing. Accordingly, Plaintiffs' requests for damages and equitable relief are not of the type the antitrust laws are intended to promote, and Plaintiffs lack standing on this basis.

In post argument briefing, Plaintiffs rely on *Brader v. Allegheny General Hospital*, 64 F.3d 869 (3d Cir.1995) and *Ertag v. Naples Community Hospital*, 121 F.3d 721 (11th Cir.1997) (*per curiam* ) (Table), an unreported decision of the Eleventh Circuit.[13] Neither case requires a different conclusion. In *Brader*, a case involving plaintiff's challenge to loss of hospital staff privileges, the court distinguished *Todorov* on the ground that unlike the complaint in the case before the court in *Todorov*, plain-

---

**12.** The fact that in *Todorov* plaintiff sought lost profits as an independent business entity and in this case, Plaintiffs seek extra compensation typically as employees of a hospital or medical corporation providing services to a hospital under contract is irrelevant. In either event, the alleged lost profits in *Todorov* or the lost additional compensation in the

form of extra salary claimed as damages in the instant action derive from artificially high pricing levels created by the antitrust violation challenged by the respective plaintiffs.

**13.** A copy of the decision is attached to Doc. No. 871.

tiff's alleged loss of income resulting from the wrongful exclusion from the relevant market was potentially anticompetitive because it reflected an attempt by plaintiff's competitors to reduce competition. *Brader, supra,* at 869. To whatever extent the facts of *Todorov* may differ from *Brader,* in the instant case, unlike *Brader,* the challenged violation is not simply an exclusion of a competitor from the market but, as evidenced by Plaintiffs' allegations, Plaintiffs' challenge constitutes an attempt to obtain supercompetitive benefits which, as in *Todorov,* requires finding that Plaintiffs lack antitrust standing. *Ertag* is also easily distinguishable as there the plaintiff neurologists, according to the court's reading of the complaint, sought lost profits which they could reasonably expect to have realized but for defendants' attempts to enforce monopoly practices resulting from the defendant hospital's decision to award an exclusive contract for radiological services. Attachment to Doc. No. 871 at 2, 7. In contrast, as discussed, *supra,* at 32–34, Plaintiffs' allegations demonstrate they seek to share in the same supercompetitive pricing without any corresponding allegation that their presence in the market will result in lower prices to the consumers of their services. As such, *Ertag* provides no support for Plaintiffs' claims to antitrust standing. Moreover, *Ertag's* holding, granting standing to a physician's displaced by a hospital's award of an exclusive contract to the physician's competitor for specialized physicians services to challenge the award on antitrust grounds is contrary to controlling Second Circuit authority. *See Balaklaw, supra.*

■ In addition, Plaintiffs are not efficient enforcers of the antitrust laws and lack standing for this reason as well. For standing to sue under Section 4 or Section 6 of the Clayton Act, the Supreme Court requires that, in addition to meeting the threshold requirement of having alleged an antitrust injury, a plaintiff also must be an efficient enforcer of antitrust laws. *Cargill, supra,* at 110 n. 5, 107 S.Ct. 484; *Associated General Contractors of California v. California State Council of Carpenters,* 459 U.S. 519, 542, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983); *Balaklaw, supra,* at 797 n. 9. Defendants contend that because Plaintiffs' primarily seek to enhance their compensation as a result of the instant litigation, they have an interest directly opposed to consumers of their services, and are thus inadequate surrogates for those who have a more immediate stake in the antitrust claims presented by this case. Defendants' Memorandum at 15 (citing cases). The Supreme Court requires consideration of several factors to determine whether a plaintiff in a federal antitrust action can be an efficient enforcer of such laws: the (1) nature of a plaintiff's injury, whether as a consumer or competitor; (2) directness or speculative nature of the relationship between the alleged antitrust violation and plaintiff's alleged injury; (3) potential for duplicative recovery or complex apportionment damages; and (4) existence of a more direct victim of the alleged antitrust violation. *Contractors of California, supra,* at 538, 539, 545, 103 S.Ct. 897. *See also Volvo North America v. Men's Int'l Professional Tennis Council,* 857 F.2d 55, 66 (2nd Cir.1988). Additionally, some, but not all, of the above factors are relevant to deciding whether a plaintiff has standing to seek injunctive relief pursuant to Section 16 of the Clayton Act. *Cargill, supra,* at 111 n. 6, 107 S.Ct. 484; *Volvo, supra,* at 66. Applying these factors to Plaintiffs' allegations, the court finds Plaintiffs are not efficient enforcers as to their Sections 14 and 16 claims.

First, Plaintiffs' allegations of the nature of their alleged injury demonstrate, as discussed, Discussion II B, *supra,* at 15–38, they have not alleged a cognizable form of

antitrust injury. Plaintiffs who seek access to a credential that, as alleged by Plaintiffs, will enable them to enjoy, as competitors, noncompetitive prices, *i.e.,* salaries, for their services, do not seek relief for a wrong the antitrust laws were intended to forestall. *Sanjuan, supra.*

Second, Plaintiffs' injuries are indirect. It is the hospitals which provide emergency medical services and thus employ or contract for emergency physicians, including Plaintiffs and ABEM physicians and ABEM eligible physicians, the insurers of the patients they treat and the self-paying patients themselves, who are directly injured as a result of the Defendants' alleged conspiracy to maintain artificially high prices for emergency service physicians through an arbitrary restriction on access to ABEM certification. *See Blue Shield of Virginia v. McCready,* 457 U.S. 465, 479, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982) (insurer's refusal to reimburse insured for psychotherapy services provided by a psychologist as opposed to those provided by physicians and psychiatrists held to state a cause of action for restraint of trade for which the insured had standing to sue under Clayton Act Section 4). In the market for emergency medical services, the patient is not the most immediate purchaser of such services. The need for immediate medical treatment often caused by a serious health problem requiring emergency room services differs significantly from the typical selection or contact of a physician by a patient seeking more routine care, a decision often made under nonurgent circumstances. Indeed, the emergency patient in many instances will be unable to make any conscious selection of an emergency physician. Hospitals, as providers of emergency medical services by physicians, through contract or employment, competent to provide emergency medical services and health care insurers, including employers and government, that reimburse the hospitals for the emergency care provided to individual patients, therefore have the most direct economic interest in the cost of such services, and, hence, are most directly affected by any conspiracy to maintain artificially high emergency physician compensation levels. It is unrealistic to expect typical emergency room patients to complain about the costs of the treating physician, or for that matter whether such physicians are even board certified, and initiate an antitrust suit to challenge it. Accordingly, the alleged injury to Plaintiffs, artificially lowered compensation as a result of the claimed conspiracy, potential competitors of such ABEM physicians and ABEM eligible physicians, is in direct opposition to the economic interests of the most immediate purchasers of such services in obtaining lower costs. Even the ultimate economic interest of the patient-insured in lower costs is superior to a competitor and supplier of such services. *Compare McCready, supra,* at 484, 102 S.Ct. 2540 (insured's unreimbursed costs caused by defendant's arbitrary refusal to pay for psychotherapy provided by psychologists where insured's and psychologist's interests were "intertwined" sustained insured's antitrust standing under Section 4). No similar intertwining of consumers' and Plaintiffs' interests exist in the instant case.

Further, for the purposes of standing, the potential harm to Plaintiffs is somewhat speculative as even if Plaintiffs were allowed to sit for the ABEM certification examination, it cannot be predicted with certainty how many of the Plaintiffs and proposed class members will ultimately qualify for and pass the ABEM examination. Physicians who sat for the ABEM examination under the practice track had a failure rate of 25%, significantly higher than the 7% failure rate for eligible physicians based on completing the ABEM resi-

dency requirement. Report of Alan S. Frankel, Ph.D, Exh. A to Ubersax Declaration at 21.

Third, the court finds, however, that the potential for duplicative or complex apportionment of damages is insignificant as Plaintiffs do not sue derivatively but rather on their own behalf.

Finally, as discussed, *supra*, there are more direct 'victims,' *i.e.*, emergency service hospitals, health care insurers and insured, of the alleged antitrust violations asserted by Plaintiffs in this case. Accordingly, in this case, the majority of the relevant factors for determining whether Plaintiffs are efficient enforcers weigh against Plaintiffs, and Plaintiffs therefore also lack standing on this ground. In sum, for the reasons discussed, Defendants' motion to dismiss for lack of antitrust standing should be GRANTED.

Because, however, the matter is before the court for a report and recommendation, should the District Judge not accept the recommendation that Defendants' cross motion to dismiss be granted, it is necessary to consider Plaintiffs' motion for class certification. Accordingly, in the interest of completeness and to avoid delay, the court turns to Plaintiffs' motion for class certification.

### III. *Plaintiffs' Request for Class Action Certification.*

Plaintiffs seek class certification for this action under Rule 23 of the Federal Rules of Civil Procedure ("Rule 23"). Fed.R.Civ.P. 23(a)-(f). In particular, Plaintiffs contend the allegations of the Second Amended Complaint support certification pursuant to Rule 23(a), (b)(2) and (b)(3). Plaintiffs' Motion to Certify Class filed February 24, 1994 ("Plaintiffs' Motion")

(Doc. No. 69); Plaintiffs' Revised Memorandum of Law at 2.

Rule 23(a) sets forth four prerequisites for class action certification: "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a). Rule 23(b), as relevant, further requires that class status may be granted to an action if Rule 23(a) prerequisites are satisfied and additionally

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; *or*

(3) the court finds that the questions of law and fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Fed.R.Civ.P. 23(b)(2) and (3) (emphasis added).[14]

In determining the required elements of class action superiority, relevant to a proposed certification pursuant to Rule 23(b)(3), the court shall consider "(A) the interest of members of the class in individually controlling the prosecution ... of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular fo-

---

**14.** As Plaintiffs discuss first the eligibility of Plaintiffs' motion under Rule 23(b)(3), Plaintiffs' Revised Memorandum at 25, the court will follow this order.

rums; (D) the difficulties likely to be encountered in the management of a class action." A class or subclass may be certified as to particular issues. Fed.R.Civ.P. 23(c)(4). Rule 23 also requires that adequate notice be provided to the class members and in the case of certification pursuant to Rule 23(b)(3), an opportunity to request an 'opt out' exclusion from the class. Fed.R.Civ.P. 23(c)(2).

Here, the proposed class is described as "all physicians who have or are now practicing medicine in the United States and who, but for the closing of the [ABEM] practice track on June 30, 1988, are now, or with the passage of time will be eligible to sit for the ABEM certification examination." Second Amended Complaint ¶ 44(a) (bracketed material added). Plaintiffs maintain that the proposed class meets all prerequisites of Rule 23(a) as well as the grounds for certification required under Rule 23(b)(2) and (b)(3). Plaintiffs' Revised Memorandum at 2.

In opposing Plaintiffs' request for a class action status, Defendants argue that (1) the proposed class is not objectively definable because determinations of eligibility for class membership by potential class members will be administratively difficult thus rendering the identification of potential class members not reasonably ascertainable. Defendants' Memorandum at 48–49; (2) the evidence required to establish how the practice track closure harmed individual class members and the determination of resulting damages cannot be established on a classwide basis, id. at 50–60; 64–65; (3) Defendants' defenses to each Plaintiff's claims will require individual proof, id. at 61; (4) the named Plaintiffs' claims are not typical of the claims of absent members of the proposed class, id. at 65–67; class action for this class is not superior to individual actions because of the possible need for numerous mini-trials

relative to issues of causation and damages, id. at 68–69; and certification pursuant to Rule 23(b)(2) is unavailable as Plaintiffs' money damage claims predominate. Id. at 69–72.

Well established principles applicable to requests for Rule 23 class certification guide the court's determination. First, the decision to grant certification is discretionary with the court. In re Holocaust Victim Assets Litigation, 225 F.3d 191, 201 (2d Cir.2000) ("the District Court has broad discretion in certifying the class."). "If the Court finds both the requirements of 23(a) have been met, and that the claims fall within the scope 23(b)(3), the Court may, in its discretion, certify the class." In re Buspirone Patent Litigation, 210 F.R.D. 43, 57 (S.D.N.Y.2002) (citing cases). Whether Plaintiffs have stated a cause of action or will ultimately prevail on the merits at trial is irrelevant; the threshold question is "whether the requirements of Rule 23 are met." Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 177–78, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). However, in assessing a request for class certification the court may also consider the "evidentiary record including any affidavits and results of discovery." In re Buspirone Patent Litigation, supra at 56. Plaintiffs seeking class status bear the burden that each requirement under Rule 23 has been satisfied. Caridad v. Metro–North Commuter R.R., 191 F.3d 283, 291 (2d Cir. 1999), cert. denied sub nom, Metro–North Commuter R.R. Co. v. Norris, 529 U.S. 1107, 120 S.Ct. 1959, 146 L.Ed.2d 791 (2000). Class actions are favored in the litigation of antitrust claims. In re Playmobil Antitrust Litigation, 35 F.Supp.2d 231, 239 (E.D.N.Y.1998) ("Because of the important role that class actions play in the private enforcement of antitrust actions, courts resolve doubts in favor of certifying the class."). Questions regarding class certification should be resolved

"in favor of and not against the maintenance of class action." *Green v. Wolf Corp.*, 406 F.2d 291, 298 (2d Cir.1968).

In antitrust cases, the required degree of commonality of issues is generally satisfied by pleading an antitrust conspiracy among defendants. *In re Alcoholic Beverages Litigation*, 95 F.R.D. 321, 324 (E.D.N.Y.1982). "The very nature of the case—involving allegations of antitrust conspiracy among defendants—appears to insure that the commonality requirement is satisfied." *Id.* The claims of those requesting class certification are deemed typical of those of the class where "the claims of the representative plaintiffs arise from the same course of conduct that gives rise to the claims of the other class members, where the claims are based on the same legal theory and where the class members have allegedly been injured by the same course of conduct as which allegedly injured the proposed representatives." *In re NASDAQ Market–Makers Antitrust Litigation*, 169 F.R.D. 493, 511 (S.D.N.Y.1996) (citing authorities). Identicality of situations between the "named representatives and the class members is not required." *Id.* (citations omitted). "Typicality refers to the nature of the claim of the class representatives and not to the specific facts from which the claim arose or relief is sought." *NASDAQ, supra*, at 510. The commonality and typicality requirements " 'tend to merge' because '[b]oth serve as guideposts for determining whether ... the named plaintiff's claim and class claims are so inter-related that the interests of the class members will be fairly and adequately protected in their absence.' " *Caridad, supra*, at 290 (quoting *General Telephone Co. v. Falcon*, 457 U.S. 147, 157 n. 13, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982)).

Further, in judging whether the alleged common issues predominate over individual issues, Rule 23(b)(3) does not require that every issue in the case be similar to every other issue presented by each class member's case. *Shelter Realty Corp. v. Allied Maintenance Corp.*, 75 F.R.D. 34, 37 (S.D.N.Y.1977), *appeal dismissed*, 574 F.2d 656 (2d Cir.1978) ("the predominance requirement calls only for predominance, not exclusivity, of common questions."). In determining whether common questions predominate, the court's inquiry is directed primarily to classwide questions of liability. *In re Blech Sec. Litigation*, 187 F.R.D. 97, 107 (S.D.N.Y.1999); *Town of New Castle v. Yonkers Contracting Co.*, 131 F.R.D. 38, 43 (S.D.N.Y.1990).

The Rule 23(b)(3) predominance requirement "tests whether [a] proposed class[ ][is] sufficiently cohesive to warrant adjudication by representation." *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 623, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) (bracketed material added and deleted). "In order to meet the predominance requirement of Rule 23(b)(3), a plaintiff must establish that 'the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, ... predominate over those issues that are subject to individualized proof,' " *In re Visa Check/MasterMoney Antitrust Litigation*, 280 F.3d 124, 136 (2d Cir.2001) (quoting *Rutstein v. Avis Rent–A–Car Sys., Inc.*, 211 F.3d 1228, 1233 (11th Cir. 2000)).

That the damages suffered by class members in antitrust actions may vary does not in itself require a disqualification for class action status. *In re Visa Check/MasterMoney Antitrust Litigation, supra*, at 139–40; *In re Buspirone Patent Litigation, supra*, at 59; *Playmobil, supra*, at 246; *NASDAQ, supra*, at 523. "Moreover [e]ven if it could be shown that some individual class members were not

injured, class certification, nevertheless, is appropriate where the antitrust violation has caused widespread injury to the class." *NASDAQ, supra,* at 523. *See also Brown v. Pro Football, Inc.,* 146 F.R.D. 1 (D.D.C. 1992) (sustaining class action status against contention that variations in particular characteristics of individual class members related to value as a professional football player require numerous trials on damage claims).

An antitrust plaintiff's intention to establish the fact of antitrust injury on a classwide basis, in contrast to a specific plaintiff's damages, favors class certification. *See In re Visa Check/MasterMoney,* 280 F.3d at 140–44 (discussing that class action can be bifurcated as to liability and damages and holding that district court not required to choose proper measure of damages before certifying class). *See also Caridad v. Metro–North Commuter R.R., supra,* at 291 (discussing class certification in employment discrimination context). Further, antitrust plaintiffs seeking class action status may also satisfy their burden of showing that a common impact upon class members caused by an alleged conspiracy can be proven on a classwide basis through the use of economic expert testimony and statistical analysis. *In re Visa Check/MasterMoney,* 280 F.3d at 133–34 (holding that charged violation injured all class members, despite asserted defenses allegedly specific to each class member, may be established by mathematical formula and affirming grant of class action status). *See Caridad,* 191 F.3d at 292 (accepting multiple regression analysis demonstrating classwide impact of alleged discriminatory practice in Title VII action despite differences in circumstances of members of class and reversing district court's denial of class certification).

In evaluating proffered expert opinion and results of statistical analysis on the question of classwide impact and damages, courts should determine whether the plaintiff's expert's proposed "econometric methodologies 'have a reasonable probability of establishing' [at trial] plaintiffs' claims by common proof." *Visa Check/MasterMoney,* 280 F.3d at 134 (quoting *In re Sumitomo Copper Litig.,* 182 F.R.D. 85, 91(S.D.N.Y.1998)). Where defendants offer opposing statistical expert opinion, in considering class certification, courts should avoid "statistical dueling," *Caridad, supra,* at 292; rather, their inquiry is limited to determining whether the proposed methodology was sufficiently reliable and not "fatally flawed" rendering it inadmissible at trial. *Visa Check/MasterMoney,* 280 F.3d at 134.

■ Proposed class representatives will be deemed adequate for purposes of Rule 23(a) unless the representatives are found to have "palpable" conflicts with the class members which "outweigh the substantial interest of every class member in proceeding with the litigation." *NASDAQ, supra,* 169 F.R.D. at 514–15.

Defendants do not contest that Plaintiffs' proposed class satisfied Rule 23(a)(1)'s numerosity requirement. Defendants' Memorandum at 17. However, Defendants, at the threshold, contend the proposed class is not objectively definable. *Id.* at 47. Specifically, Defendants assert that Plaintiffs' definition of the proposed class is imprecise thereby creating undue administrative burdens based on the need for innumerable determinations of each class member's eligibility to sit for the ABEM examination. *Id.* at 48–49. Defendants further argue that as Plaintiffs' definition is open ended, *i.e.,* that based on Plaintiffs' claimed definition of the class which includes physicians who have practiced emergency medicine after 1988, potential class members may continue to qualify under the criteria of the former

ABEM practice track and the members of the proposed class will never be accurately known. *Id.*

To qualify for Rule 23 certification the proposed class must be objectively defined and capable of reasonable ascertainment. *See In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation,* 209 F.R.D. 323, 336 (S.D.N.Y.2002) (" 'An identifiable class exists if its members can be ascertained by reference to objective criteria.' ") (quoting *Zapka v. Coca-Cola Co.,* 2000 WL 1644539, at *2 (N.D.Ill. Oct.27, 2000)); *Garrish v. United Automobile, Aerospace, and Agricultural Implement Workers of America,* 149 F.Supp.2d 326, 330-31 (E.D.Mich.2001) (proposed class must be sufficiently defined "so that it is administratively feasible for the court to determine whether a particular individual is a member of the proposed class ... [and] the identity of class members, moreover, must be ascertainable by reference to objective criteria.") (internal quotations omitted); *McGee v. East Ohio Gas Company,* 200 F.R.D. 382, 387 (S.D.Ohio 2001) (class must be defined "such that a court can ascertain its membership in some objective manner"); *Neumont v. Monroe County, Florida,* 198 F.R.D. 554, 557, (S.D.Fla. 2000) (for a class definition to be viable, class membership must be capable of ascertainment under some objective standard); *Clay v. American Tobacco Co.,* 188 F.R.D. 483, 490 (S.D.Ill.1999) ("It is absolutely necessary that for a class action to be certified, the class must be susceptible to a precise definition."); and *O'Connor v. Boeing N. Am., Inc.,* 184 F.R.D. 311, 319 (C.D.Cal.1998) ("a class will be found to exist if the description of the class is definite enough so that it is administratively feasible for the court to ascertain whether an individual is a member"). Here, the ABEM practice track eligibility requirements which existed up to June 1988 are not in doubt. ABEM Application Form attached as Exhibit D to Reply Declaration of Jeremy R. Kasha, Esq. dated July 31, 2000 (Doc. No. 799) ("Kasha Reply Declaration"). The fact that ABEM itself successfully applied these requirements to thousands of physician applicants over a 12 year period, Exhibit C to Kasha Reply Declaration, demonstrates that the criteria can be objectively applied. Further, as to those physicians who, over time, may become eligible, after 1988, for the ABEM examination under the practice track criteria, their credentials can be evaluated by ABEM, or, if necessary, a special master. *In re Visa Check/MasterMoney,* 280 F.3d at 141. Thus, Plaintiffs' proposed class, based on a reference to such criteria and despite the passage of time, is objectively defined.

For purposes of calculation of Rule 23(b)(3) class damages, physicians who qualify under the practice track criteria after 1988 and up to the date the court may grant relief would be considered class members as they then would have acquired the required degree of emergency medicine practice experience; thereafter, physicians who may qualify under the practice track would receive the benefit of a judgment under Rule 23(b)(3), or any equitable relief the court may also order, making the practice track form of eligibility a continuing opportunity for qualification to be administered by ABEM as it had previously done. Plaintiffs' Reply Memorandum at 23. Defendants' cases, Defendants' Memorandum at 47–48, are distinguishable in that plaintiffs in those cases presented proposed class definitions which, as pleaded, were too amorphous to provide any objective basis upon which to determine class membership. *See, e.g., Simer v. Rios,* 661 F.2d 655, 669 (7th Cir.1981) (rejecting a class of persons who became discouraged by defendants' actions

from applying for public assistance, because of the need to identify potential class members' state of mind). Accordingly, Plaintiffs' proposed class definition provides a sufficiently objective basis on which membership in the class may be ascertained.

■ Defendants' contentions that Plaintiffs' proposed class fails to satisfy the commonality, typicality and predominance tests for certification pursuant to Rule 23(b)(3) are also without merit. First, contrary to Defendants' assertion that Plaintiffs' alleged multiple conspiracies thus defeating Plaintiffs' asserted common issue of antitrust liability, Plaintiffs' have alleged a single conspiracy among Defendants. Second Amended Complaint ¶¶ 4, 5, 12, 45–62, (describing the history of ABEM's initial creation and subsequent closure of the practice track with the "cooperation, agreement, and encouragement of the other defendants and co-conspirators." ¶ 62) As this is an antitrust case, the allegation satisfies both the commonality and predominance requisites. *NASDAQ, supra*, at 518. Second, numerous common questions of fact and law are presented by the Second Amended Complaint including whether Defendants and other alleged coconspirators are members of the charged conspiracy, Second Amended Complaint ¶¶ 56–57, 113, 132–34; its scope and effect upon Plaintiffs' ability to compete, *id.* ¶¶ 88, 115; the existence of the relevant market, *id.* ¶¶ 91–92; the reasonableness of the closure of the practice track, *id.* ¶ 8; the closure's impact upon competition and the supply of ABEM emergency medicine certified physicians, *id.* ¶¶ 89–90, 92; Defendants' efforts to monopolize the relevant market, *id.* ¶ 123; whether the conspiracy caused noncompet-

itive higher prices for the services of ABEM certified physicians and physicians eligible for ABEM certification, *id.* ¶¶ 92–96; and the economic losses of the class members, *id.* ¶¶ 103–110. As each class member alleges that the conspiracy operated upon them in violation of Sections 1 and 2 of the Sherman Act, each class member would, in the case of individual actions, be required to establish the existence of the conspiracy, its implementation, duration and scope, each defendant's participation, how the conspiracy violated federal antitrust law, the effectiveness of the conspiracy, and whether it unreasonably injured competition. Thus, Plaintiffs' class allegations meet the commonality requirement. *See NASDAQ, supra*, at 518.

■ Defendants' contention that Plaintiffs have failed to establish a common conspiracy, Defendants' Memorandum at 62–63, and that each Hospital Defendant applied its hiring policies to specific Plaintiffs pursuant to the conspiracy, *id.*, impermissibly burdens Plaintiffs, for the purposes of the instant class certification motion, with the obligation to establish a likelihood of success on the merits. *See Eisen, supra* (improper for court to consider merits on motion for class certification). As noted, *supra*, Plaintiffs have pointedly alleged a common conspiracy among all named Defendants, including Hospital Defendants. Additionally, Plaintiffs have been, by prior orders of the court, precluded from pursuing discovery on the merits. Decision and Order dated October 20, 1998 (Doc. No. 630) ¶ (f) at 13.[15] Moreover, Plaintiffs may rely on the principle that antitrust liability is joint and several among defendant coconspirators. *NASDAQ* at 519. Thus, any failure to establish for the purposes of the instant

---

**15.** Referring to orders staying discovery directed to the merits of Plaintiffs' causes of action and Defendants' defenses dated April 29, 1994 (Doc. No. 139) and February 21, 1996 (Doc. No. 470).

motion each class member's injury at the hands of a particular Hospital Defendant will not defeat Plaintiffs' ability to establish Defendants' liability, pursuant to Sherman Act Sections 1 and 2, on a classwide basis as alleged in the Second Amended Complaint. Accordingly, Defendants' argument that Plaintiffs cannot establish each Plaintiff was harmed by a specific Hospital Defendant, does not bar class action status.

Defendants' reliance on *Abrams v. Interco, Inc.*, 719 F.2d 23 (2d Cir.1983), Defendants' Memorandum at 64, is misplaced as in that case the complaint described several forms of conspiratorial misconduct and class member purchasers of multiple product lines. *Abrams, supra*, at 23, 29–30. Here, Defendants' liability and Plaintiffs' injuries are based on a common allegation of fact and law—a wrongful withdrawal of a means, *i.e.*, the 1988 closure and continuing closure of the ABEM practice track—by which suppliers of emergency medical services may obtain a competitive benefit. Indeed, Defendants' contention, as the basis for their cross motion to dismiss, that Plaintiffs, as individuals and as a class, lack antitrust standing, Discussion, *supra*, Section II B, is premised on the proposition that none of the class members, including representative Plaintiffs, have suffered a cognizable antitrust injury, an issue of palpable classwide dimension and controlling legal significance, demonstrating the existence of a classwide liability issue.

Defendants assert that as there are many categories of Plaintiffs who could not or would not have applied prior to June 1988 under the practice track, Plaintiffs' claims cannot satisfy Rule 23's typicality and predominance requirements. Defendants' Memorandum at 20–34. For example, Defendants contend that because some

Plaintiffs "could have qualified under the practice track by June 1988, but chose not to apply," *id.* at 20–21, and others decided upon specialization in fields other than emergency medicine and thereby were prevented from practice track qualification based on personal and professional decisions, *id.* at 21–22, it follows that representative Plaintiffs, and those within the class with similar personal and professional history characteristics, cannot demonstrate on a common basis antitrust injury and damage resulting from the alleged conspiracy. *Id. See Visa Check/MasterMoney Antitrust Litig., supra*, at 136 (noting elements of certification of antitrust claims include proof of injury, causation and damages).

Further, Defendants claim that as Dr. Dennis Carlton, Plaintiffs' expert, has only developed a proposed statistical methodology to establish the presence of classwide impact flowing from the conspiracy, the proposed methodology cannot satisfy the requirements of Rule 23(b)(3) that common issues of liability exist and predominate. *Id.* Specifically, Defendants state that the record in this case demonstrates that "many plaintiffs have experienced no impact at all caused by the closure of the practice track, and that the timing, duration, type and amount of the impact alleged by others varies enormously, and would in almost every case require substantial individualized proof of disputed facts." Defendants' Memorandum at 20. Defendants conclude that as Plaintiffs' proposed multiple variable regression model cannot take all such factors into account, it therefore will produce inaccurate results. *Id.* Defendants' contentions are unavailing for several reasons.

First, irrespective of Dr. Carlton's proposed multiple regression model, Plaintiffs' allegations that Defendants' contentions related to Plaintiffs' lack of antitrust

standing and the opinion of Plaintiffs' and Defendants' econometric experts, demonstrate the existence of antitrust injury on a classwide basis. Plaintiffs' class members were all allegedly harmed in that as a result of the charged conspiracy, all class members were deprived of the opportunity to take the ABEM certification examination. Second Amended Complaint ¶¶ 13, 44(a); Carlton Dep. at 116. Moreover, as discussed, *supra*, Defendants' argument that Plaintiffs' ability to compete is not affected by the conspiracy raises questions of the existence of antitrust injury and its effect on Plaintiffs and the proposed class members on a classwide basis. Additionally, Dr. Carlton opined that his proposed regression analysis could establish the extent to which each class member was damaged based on the estimated annual pay loss resulting from the adverse economic effect of the conspiracy on a classwide basis regardless of individual variations, analogous to similar methods for calculating damages in class action price fixing cases. Carlton Dep. at 271–72, 275–76; Carlton Affidavit ¶ 11. Further, any fees paid by class members to appeal a denial of eligibility based on practice experience represents a potential element of classwide damages directly attributable to the alleged violation sufficient to establish predominance. Carlton Dep. at 319–20. Finally, Dr. Frankel, Defendants' expert acknowledged the existence of classwide damages flowing from the challenged practice track closure as such class members were required to enter and complete an approved medical residency. Frankel Dep. at 397–402. Specifically, Dr. Frankel agreed that such damages accrued to class Plaintiffs who were rendered ineligible to take the ABEM examination by virtue of the practice track closure although the amount of such classwide antitrust injury was in Dr. Frankel's view limited to an assumed application fee and the cost to applicants of a residency program in emergency medicine. Frankel Dep. at 397. Thus, the fact that each class member, in order to avoid the loss of increased earning expected from ABEM certification, would have, after 1988, been required to incur the expense of achieving eligibility for ABEM certification solely through an approved residency program, demonstrates that each member of the class as defined incurred an antitrust injury caused directly by the alleged antitrust violation, potentially amounting to several hundreds of thousands of dollars for each class member so affected. *Id.* The fact that an antitrust plaintiff may have incurred even greater damages from other effects of the conspiracy that were conceivably avoidable, as Defendants contend, does not exempt the charged conspiracy from antitrust liability. *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 114 n. 9, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969) (citing cases) ("an antitrust plaintiff's burden of proving the fact of damage under Section 4 of the Clayton Act is satisfied by its proof of *some* damage flowing from the unlawful conspiracy") (underline added). Such questions are equally resolvable on a classwide basis here where the alleged conspiracy presented identical barriers to each class member's opportunity to obtain ABEM certification.

Second, use of multiple variable regression analysis, as proposed by Dr. Carlton, to prove antitrust impact on a classwide basis has been accepted by the courts as justifying class certification. *In Re Polypropylene Carpet Antitrust Litigation,* 996 F.Supp. 18, 25–30 (N.D.Ga.1997) (certifying class in antitrust action where regression analysis was admissible under the *Daubert* test and established both common injury and damages on class-wide basis). *See, e.g., Caridad, supra* (multiple regres-

sion analysis sufficient to establish racial discrimination as to promotion and discipline on classwide basis despite existence of variations based on specific positions and development of discretionary authority to department supervisors). "Multiple regression analysis is a statistical tool used .... to determine the influence that various independent, predetermined factors (so-called 'independent variables'") have on an observed phenomenon (the so-called "dependent variable") .... The first step in such a regression analysis is to specify all of the possible "legitimate ... [factors not prohibited by law] that are likely to significantly affect the dependent variable and which could account for [the alleged] disparities in [plaintiffs' income]." *Ottaviani v. State University of New York at New Paltz*, 875 F.2d 365, 366–67 (2d Cir. 1989) (internal citations omitted) (multiple regression analysis admissible but determined to be insufficient to sustain plaintiffs' burden at trial) (bracketed material added), *cert. denied*, 493 U.S. 1021, 110 S.Ct. 721, 107 L.Ed.2d 740 (1990). In this case, the dependent variable is the compensation of emergency medicine physicians. Carlton Affidavit ¶ 19; Carlton Dep. at 191. Other factors which may affect the potential correlation between the dependent variable and the suspected independent or "explanatory" variable of having or not having ABEM certification should also be included in the proposed regression analysis but may be estimated. Carlton Dep. at 91–92. Here, Dr. Carlton has described a multiple regression analysis model which he believes is capable of establishing a causal relationship between the income of class members and the lack of ABEM certification. Carlton Affidavit at 8–11. Dr. Carlton also opines that another statistical method can be used to establish the value of damages suffered by members of the class. *Id.* at 5.

Defendants argue that Dr. Carlton's failure to take into account other factors such as professional or personal history bearing on the issue of causation and damages renders his proposed methodology incapable of sustaining Plaintiffs' burden to show that common issues of causation and damages predominate. Defendants' Memorandum at 5. However, Dr. Carlton's methodology will not exclude the additional factors Defendants point to as relevant to the capacity of the proposed regression analysis to accurately correlate ABEM certification with physician compensation, *e.g.*, "patient acuity" and "performance merit." Carlton Dep. at 215, 243. Rather, Dr. Carlton intends to use data which will be obtained through merit based discovery to determine which additional factors should be included. *Id.* at 251–52; 293–94. Nor is the model designed to award damages based on the lack of ABEM certification to any class member for the period when such class member did not practice emergency medicine. Carlton Reply Affidavit ¶ 23.

It is sufficient for class certification that the proposed regression analysis be reasonably capable of providing evidence from which the causation element of Plaintiffs' case be inferrable on a classwide basis. *See In re Sumitomo Copper Litig.*, 182 F.R.D. 85, 91 (S.D.N.Y.1998) (upholding class certification based on "plaintiffs' econometric methodologies [which have] a reasonable probability of establishing" plaintiffs' claims by common proof). The court finds Dr. Carlton's model capable of performing this function. *Bazemore v. Friday*, 478 U.S. 385, 400–401, 106 S.Ct. 3000, 92 L.Ed.2d 315 (1986) (concurring op.) (multiple regression analysis which accounts for "major factors" need not account for all variables; omission of variables goes to probativeness not admissibility). Accordingly, as Dr. Carlton's proposed regression model will not

necessarily overlook "major factors," *Bazemore, supra,* bearing on the relationship of ABEM certification to physician compensation, Defendants' objection that the statistical model has yet to produce proof that the effect of the practice track closure can be established for all class members is tantamount to asking the court to hold that Plaintiffs are unable to satisfy their burden as to the causation element of their claim, an issue beyond the purview of a motion seeking class certification. *See Eisen, supra; In re Visa Check/MasterMoney Antitrust Litig.,* 280 F.3d at 134 (citing *Caridad, supra,* at 292–93). As such, Defendants' arguments do not require Dr. Carlton's methodology be rejected. *See In re Visa Check/MasterMoney Antitrust Litig., supra,* at 133 (expert's "theory" of causation and "proffered" formula accepted as basis to demonstrate predominance on issues of causality and damages).

Dr. Carlton has offered a method, based on generally accepted statistical principles, which he believes is capable of sustaining Plaintiffs' burden on the issues of common impact and damages. "A standard statistical analysis can be used to estimate the effect of ABEM certification on an individual's income, *holding constant all other characteristics* that affect emergency medicine physicians' earnings." Carlton Affidavit ¶ 17 (emphasis added). As noted, Dr. Carlton expects that other factors, such as those emphasized by Defendants, may be included in the regression model as a result of merit based discovery which has been stayed. "[A] regression analysis can be used to determine *whether incorporating additional information* (e.g., years of experience) results in more reliable individual damage estimates." Carlton Reply Affidavit ¶ 21 (emphasis added). Dr. Carlton's status as an economic expert for antitrust cases has been accepted by other courts. *In re Visa Check/MasterMoney*

*Antitrust Litig.,* 192 F.R.D. 68, 78 (E.D.N.Y.2000) (Dr. Carlton's credentials as an economics expert found "impeccable"), *aff'd,* 280 F.3d 124 (2d Cir.2001).

Defendants' expert, Dr. Frankel, attempts to impeach the reliability of Dr. Carlton's methodology because it fails to take into account unobservable characteristics of emergency medicine such as "physician quality" and, thus the compensation of such physicians. Report of Alan S. Frankel, Ph.D., Exhibit A to Ubersax Declaration ("Frankel Report") at 46. However, as discussed, Dr. Carlton's proposed methodology, will not ignore factors objectively bearing on physician quality and compensation. Carlton Reply Affidavit ¶ 27. "If 'quality' cannot be observed, it will not affect wages and thus cannot be a basis for damage estimates. Furthermore, if 'quality' can be observed to some extent by employers, it will not affect damage estimates if it is highly correlated with observable characteristics other than certification (*e.g.,* years of experience)." *Id.* The court finds this analysis sufficiently credible to support, based on Dr. Carlton's opinion, that primarily observable characteristics affect physician compensation. Moreover, as discussed, national surveys, uncontradicted by Defendants, support the view that ABEM accredition is strongly correlated with higher compensation for emergency physicians. Defendants do not contend that ABEM certification is an unobservable characteristic.

Dr. Frankel also states that Dr. Carlton's proposed regression analysis is insufficient as a basis for sustaining class status because it fails to take into consideration other factors likely, in Dr. Frankel's view, to influence emergency medicine physician compensation such as physician intelligence, performance reviews and recommendations. Frankel Report at 46. There are several reasons why this criti-

cism does not demonstrate that classwide issues of liability, causation and damages do not predominate. First, as discussed, Dr. Carlton explained that the proposed regression model will include factors, other than those specifically mentioned in his affidavits such as employment in an urban area, years of experience, and size of hospital, Carlton Affidavit ¶ 20, that could conceivably correlate with physician compensation to avoid the possibility that in their absence the regression model may erroneously correlate increased compensation with ABEM certification. Carlton Dep. at 196. Specifically, Dr. Carlton acknowledged that there are other possible independent variables he may consider adding including "performance merit." Carlton Dep. at 215, 222. Further, Dr. Carlton intends to employ standard econometric techniques to determine whether such factors may have significance and should be included in the regression model. Carlton Dep. at 216. To assist in this determination, Dr. Carlton will develop, through discovery, data from available sources upon which the relevance of such other potentially relevant variables may be determined, including the records of Hospital Defendants. *Id.* at 217.

However, the failure to include all such potential variables does not render the results of Dr. Carlton's proposed regression analysis invalid. Carlton Dep. at 219, 220. Specifically, in Dr. Carlton's opinion, the absence in the regression model of every variable that may correlate with the dependent variable of a physician's annual income does not render the model useless. *Id.* at 194. "[I]t's routine and statistical [sic] in economic modeling that you ... do not have every single factor that effects every single dependent variable, yet these models have turned out to have great usefulness." *Id.* As discussed, the failure to include all potential variables in an economic regression analysis does not render

the analysis incompetent. *Bazemore v. Friday,* 478 U.S. at 399–401, 106 S.Ct. 3000.

It is, moreover, improper to reject Dr. Carlton's methodology based on the criticism provided by Defendants' expert as such would render a determination based on "dueling experts." *Caridad, supra.* Whether, in the event of a trial on the merits, Dr. Carlton will be ultimately persuade the trier of fact that his method for establishing classwide impact and damages is accurate is beyond the purview of the instant motion. At this stage, so long as the party seeking class certification has provided a "colorable method" for proving classwide injury, *In re Disposable Contact Lens Antitrust Litig.,* 170 F.R.D. 524, 531–32 (S.D.Fla.1996), courts should not deny certification on the basis that such method may ultimately be unpersuasive at trial. *In re Visa Check/MasterMoney,* 280 F.3d at 134.

To the extent such additional factors may relate to determinations by employers of physician quality and thus influence compensation, Dr. Carlton states that, "quality effects can be controlled by analyzing the extent to which an individual physician's wages increase after that physician becomes ABEM certified—because the *physician's 'quality' does not change as a result of certification, the change in wage is attributable solely to certification.*" Carlton Reply Affidavit, ¶ 28 (emphasis added). Additionally, Dr. Carlton, an acknowledged scholar and expert in the field of econometrics, has offered his expert opinion, based on published data and surveys of physicians' compensation, that "'but for' the [alleged] conspiracy, class members would have earned ... more than they actually earned." Carlton Affidavit ¶ 11. Dr. Carlton also opined that the conspiracy had a "common adverse impact on members of the class." *Id.*

¶ ¶ 13–15. Moreover, Dr. Carlton avers that "[i]t is possible to measure the damage that each member of the class can have expected to suffer by the use of a common formula." *Id.* ¶ 16. Thus, Dr. Carlton's regression model which seeks to measure the relationship between physician income and ABEM certification is not without a rational basis, will not necessarily overlook important factors relevant to the issues, and, together with his expert opinion based on published data on the probable relationship between ABEM certification and emergency medicine physicians compensation, provides an adequate reason to find that Plaintiffs' claims satisfy the requirements of Rule 23(a) and (b)(3). Even if the proffered regression analysis were to fail, Plaintiffs could still offer Dr. Carlton's expert opinion to establish the elements of their claims on a classwide basis. *See In Re Visa Check/MasterMoney, supra,* at 136–37 (sustaining class action certification based on Dr. Carlton's expert opinion and proposed methodology without including a multiple regression analysis). Accordingly, Defendants' attack on Dr. Carlton's proposed methodology is premature and insufficient to require its rejection as a basis upon which to demonstrate commonality and predominance.

Defendants insist, nevertheless, that numerous explanations, arising from personal life and professional career choices, for the failure of particular Plaintiffs to achieve practice track qualification, require that class action status for this case be denied. Defendants' Memorandum at 20–42. Specifically, Defendants argue that as the existence of such individual variations demonstrates that Plaintiffs cannot show, based on common evidence, the practice track closure in 1988 caused their injuries, class certification is accordingly improper. Defendants' Memorandum at 20. However, such contention requires a finding that the causation element of Plaintiffs' antitrust claim on classwide basis through the use of common proof cannot be satisfied even with the use of Plaintiffs' proposed multiple regression analysis and, as such, amounts to a premature determination of the merits, prohibited at the class certification stage of the case. *Eisen, supra.* Any determination that an essential element of Plaintiffs' claims is incapable of proof, whether through use of the results of a multi-variable regression analysis or other data and expert opinion, must be interposed and resolved by summary judgment or at trial. *See Ford v. Nylcare Health Plans of the Gulf Coast, Inc.,* 301 F.3d 329 (5th Cir.2002) (grant of summary judgment for lack of standing and denial of class certification affirmed where record failed to establish causal relationship between alleged violation and plaintiffs' damages). Defendants' argument also ignores the possibility that even if some class members chose not to attempt to qualify for the ABEM practice track prior to 1988, such qualification based on practice experience could have been acquired after that date if such physicians had subsequently chosen to do so. Plaintiffs' antitrust claims cover the initial closure of the practice track in 1988 by the conspiracy and its objective to ensure that the closure remain in effect thereafter. Second Amended Complaint ¶ 12 ("Defendants and their co-conspirators have unlawfully conspired . . . to maintain closure of the practice track despite the needs of the public, the medical profession and the specialty of emergency medicine.")

As discussed, Defendants contend that the presence of numerous factors peculiar to each class member's personal circumstances affect calculation of the amount of any damages suffered by individual class members and requires numerous individual trials foreclosing class certification. Defendants' Memorandum at 64–65.

However, at the class certification stage, Plaintiffs need only demonstrate the existence of a reasonable basis on which damages can be determined at trial. *United States Football League v. National Football League*, 842 F.2d 1335, 1378 (2d Cir. 1988) ("once proof of injury causation has been established, courts have allowed antitrust plaintiffs considerable latitude in proving the amount of damages."). In an antitrust case, the trier of fact will use "a just and reasonable estimate ... based on relevant data" including both "probable and inferential as well as ... direct and positive proof." *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264, 66 S.Ct. 574, 90 L.Ed. 652 (1946). Employing relevant data to be collected from the class during merit based discovery, Plaintiffs' proposed regression analysis is expected to be capable of reasonably estimating the damages suffered by individual class members irrespective of particular circumstances. Carlton Affidavit ¶ 14; Carlton Reply Affidavit ¶ ¶ 16–22.

In *Brown v. Pro Football, Inc.*, 146 F.R.D. 1 (D.D.C.1992) the court rejected as a basis to refuse class certification defendants' asserted differences among class members, professional football players, including experience, evaluations of athletic ability, and future employment opportunities. As the court stated, "[a]lthough individual circumstances necessarily exist among the members of the plaintiff class, a reasonable approximation of damages is achievable through a common formula." *Brown, supra*, at 3. Indeed, the presence of individual damages issues cannot, in itself, defeat class certification particularly in antitrust actions. *Playmobil*, 35 F.Supp.2d at 246. "[E]ven if it develops that each class member's damages must be separately determined, class certification would still be appropriate." *NASDAQ, supra*, at 524 (citing cases).

Defendants' reliance, Defendants' Memorandum at 52, upon *Kent–Chojnicki v. Runyon*, 180 F.R.D. 237 (W.D.N.Y.1998) is misplaced. In *Kent–Chojnicki*, this court denied class certification to a group of disabled postal workers who claimed violations of the Rehabilitation Act based on work assignments beyond the limitations prescribed by their respective physicians. *Kent–Chojnicki, supra*, at 243. Specifically, the court found that the proposed class could not satisfy Rule 23(a)'s requirements as the basis for the class members' claims turned on the job requirements imposed on each plaintiff by their respective physician's specific limitations, thereby negating the requisites of commonality and predominance. *Id.* at 243. Thus, in *Kent–Chojnicki*, plaintiffs' own allegations showed that individual circumstances governed the ability of plaintiffs to establish liability quite aside from any questions of causality or damages. Here, in contrast, Plaintiffs' alleged deprivation of access to a significant professional credential is based on a single causative act, closure of the ABEM practice track, by a single conspiracy. Seconded Amended Complaint ¶ ¶ 45–62. Thus, the issue of antitrust liability in this case is manifestly within the requirements of Rule 23(b)(3). Moreover, in *Kent–Chojnicki*, plaintiffs did not proffer any expert testimony or regression analysis to support their class certification request.

The case of *Continental Orthopedic Appliances, Inc. v. Health Insurance Plan of Greater New York, Inc.*, 198 F.R.D. 41 (E.D.N.Y.2000), submitted to the court by Defendants' letter dated October 29, 2001 (Doc. No. 865), is also distinguishable. In *Continental Orthopedic*, the court found that the existence of different contractual relationships between class members and defendant insurer and differing percentages of total business income attributable to sales with defendant insurer necessitated a finding that individual issues of causa-

tion and damages predominated. Here, unlike allegations in *Continental Orthopedic,* Plaintiffs' claimed injuries all proceed from a single alleged violation, the closure of the practice track, and a reasonable basis, founded on accepted principles of economics and statistics and "impeccable" expert testimony, is presented to establish the causation and damage elements of Plaintiffs' claims on a classwide basis. Accordingly, the court finds *Continental Orthopedic Appliances, Inc., supra,* of no controlling effect.

Nor does the recent case, *Weisfeld v. Sun Chemical Corp.,* 210 F.R.D. 136 (D.N.J.2002), submitted by Defendants after oral argument (Doc. No. 873), cast doubt on the court's finding that Dr. Carlton's proffered methodology is a sufficient basis upon which the predominance requirement as to classwide injury and damages may be shown. In *Weisfeld,* a proposed class of employees of defendants, printing ink manufacturers, during a four year period when defendants allegedly agreed not to solicit or hire each other's employees, attacked the agreement as a restraint of trade in violation of the Sherman Act. *Weisfeld, supra,* at 137. As relevant, plaintiffs in *Weisfeld* sought to satisfy Rule 23's predominance requirement on the issue of classwide antitrust injury by proffering an economist expert's affidavit which asserted that, using a multiple regression model and "yardstick" industry comparison, it would be possible to determine that but for the existence of the challenged agreement, compensation for plaintiffs' class would have been greater. Notwithstanding the expert's assertions that the methodologies, including a "preliminary analysis" which had found compensation levels would have been greater without the presence of defendants' agreement, would provide "generalized proof" of a classwide antitrust impact resulting from the agreements, the court denied class cer-

tification. *Id.* at 143–44. Specifically, the court found that the expert had failed to specifically state the two methodologies would establish a causal relationship or impact between the agreement and each class member. *Id.* at 143. The court also held that the expert's failure to offer evidence, such as data, charts or exhibits to support his opinion, rendered such opinions "naked conclusions." *Id.* The court further noted the existence of several facts, particularly the existence of no-compete agreements executed by "some" class members, that cast doubt on whether plaintiffs had suffered any antitrust injury from the operation of the agreement. *Weisfeld,* at 144.

However, *Weisfeld* is readily distinguishable in several respects from the instant matter. First, Dr. Carlton, unlike plaintiffs' expert in *Weisfeld,* has opined that his proffered method will establish antitrust injury as to each plaintiff class member. "Based on my review of the economic evidence presently available, I find that the conspiracy alleged by the class would be expected to have an adverse effect on *each* class member. I also conclude that it would be possible to estimate expected damages suffered by *each* class member with a formula that could be applied to the *entire* class." Carlton Affidavit ¶ 4 (underlining added). Second, Dr. Carlton has consulted a substantial body of existing data in reaching his preliminary findings. Specifically, Dr. Carlton referred to an independent national survey of the salaries of emergency physicians over the period 1991–1999 finding a $20,000 to $30,000 differential in per physician's annual compensation between non ABEM certified and ABEM certified physicians. Carlton Affidavit ¶ 13. Regional surveys reflect similar findings. *Id.* ¶ 14. A survey of differences in total compensation between such physicians was also relied upon by Dr.

Carlton. *Id.* ¶ 15. Dr. Carlton supplemented his affidavit with two charts compiling the survey data. Carlton Affidavit Figures 1 & 2. Further, Dr. Carlton's Reply Affidavit makes use of other independently developed data implying a classwide impact on Defendants' conspiracy. For example, Dr. Carlton referred to a 1999 survey suggesting that larger hospitals were ten times more likely to require board certification as a condition to employment for emergency physicians. Carlton Reply Affidavit ¶ 9 n. 3. Dr. Carlton also relied upon an empirically based analysis showing a "substantial" positive relationship between board certification and physicians compensation. *Id.* Exh. A. Thus, Dr. Carlton's opinion is not based, as was found by the court regarding plaintiff's expert opinion in *Weisfeld*, on "naked conclusions." Rather, Dr. Carlton's opinion is based upon a substantial body of independently created data tending reasonably to confirm his preliminary conclusions as to the classwide impact of Defendants' closure of the practice track upon the compensation of the proposed class.

Finally, the nature of the individual factors which the *Weisfeld* court found to predominate do not compare in any relevant manner to those relied upon by Defendants. Particularly, the court in *Weisfeld* emphasized the potential existence of non-compete agreements between an unstated number within the proffered class as a fact likely to negate the existence of classwide antitrust injury. *Weisfeld, supra,* at 144. In contrast, here it is alleged that closure of the practice track directly prevented every class member from seeking ABEM certification, and continues to do so. As discussed, the multiple regression analysis and Dr. Carlton's "impeccable" credentials as a nationally recognized expert economist provide an adequate basis to account for any relevant variables in the particular circumstances of individual class members in seeking to establish a classwide impact caused by the charged violation in this case. Even if, based on the record in *Weisfeld,* the court's determination of the class certification issues presented was correct, the reasoning in that case has no relevance to the issues presented on the instant record.

Finally, even if the individual circumstances of some class members could eventually require special consideration as to the extent, if any, of their respective damages, such potentialities do not defeat class certification. *In re Buspirone, supra,* at 56. Such individual issues may be resolved after liability is established, and, if necessary, subclasses may be created to facilitate a complete and efficient resolution of the case. *Id.*

Thus, Defendants' contention that class certification should be denied in this case based on variations among class members' circumstances that may bear on the elements of causation and calculation of Plaintiffs' damages is without merit. Defendants' further argument that class certification should be denied because their defense of Plaintiffs' claims requires individual trials based on the existence of such personal factors, Defendants' Memorandum at 61 is also unpersuasive. *Broussard v. Meineke Discount Muffler Shops,* 155 F.3d 331, 345 (4th Cir.1998) relied upon by Defendants for the proposition that the existence of individual defenses defeats class certification has been rejected by other courts, *e.g., Waste Management Holdings, Inc. v. Mowbray,* 208 F.3d 288, 296 n. 4 (1st Cir.2000) and is not the law in this circuit. *See Visa Check/MasterMoney Antitrust Litig.,* 280 F.3d 124, 138 (rejecting contention that presence of defendant's mitigation defense to damages suffered by plaintiffs as a result of defendant's alleged tying arrangement as "fact that a defense 'may arise and may affect

different class members differently does not compel a finding that individual issues predominate over common ones' " (quoting *Waste Management Holdings, supra,* at 296)); *accord Williams v. Sinclair,* 529 F.2d 1383, 1388 (9th Cir.1975) (stating that existence of a defense "does not compel a finding that individual issues predominate over common ones" when there is a "sufficient nucleus of common questions"). "Therefore the question for purposes of determining predominance is not whether a defense exists, but whether the common issues will predominate over the individual questions raised by that defense." *Visa Check/MasterMoney, supra,* at 137. *See also In re Buspirone, supra* at 57 (extent of injury, based on allege defenses to individual class members' damage claim no ban to class certification) (citing *In re Visa Check/MasterMoney, supra* and other cases). Here, the court finds that class-wide issues of the existence of the conspiracy, its effect on class members, and Plaintiffs' damages predominate.

 Plaintiffs' allegations also satisfy the typicality requirements under Rule 23(a)(3). Rule 23(a)'s typicality requirement is met where "the claims of the representative [p]lantiffs arise from the source of conduct that gives rise to the claims of the other [c]lass members, where the claims are based on the same legal theory, and where class members have allegedly been injured by the same course of conduct as that which allegedly injured the proposed representatives." *NASDAQ, supra,* at 511 (citing cases). *See also Robidoux v. Celani,* 987 F.2d 931, 936 (2d Cir.1993) ("Rule 23(a)(3)'s typicality requirement is satisfied when each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove

defendant's liability."). Plaintiffs' allegations describe the same conspiratorial conduct directed against each Plaintiff and all class members by limiting the supply of ABEM certified physicians and ABEM eligible physicians, Second Amended Complaint ¶¶ 56–57, and, as such, the allegations are based on the same legal theory. *NASDAQ,* 169 F.R.D. at 511. Further, each of the six physicians proposed as class representatives by Plaintiffs, Drs. Daniels, Cummings, Timmons, Paulson, Romanosky, and McNulty, claim to have been injured by the same conduct as the Second Amended Complaint alleges as to members of the class. Daniel Decl. ¶ 9; Cummings Decl. ¶ 8; Timmons Decl. ¶ 11; Paulson Decl. ¶ 10; Romanosky Decl. ¶ 10; McNulty Decl. ¶ 9.[16] Thus, as the Second Amended Complaint alleges Plaintiffs have been injured in the same way as have members of the class based on the same antitrust violations and have incurred similar damages representative Plaintiffs' claims are typical of those of the class as required by Rule 23(a)(3).

 Finally, Defendants assert the proposed class fails to meet requirements of Rule 23(b)(3) that class treatment is "superior to other available methods for the fair and efficient adjudication of the controversy." Defendants' Memorandum at 68–69. Specifically, Defendants assert Plaintiffs have failed to provide a "trial plan" to show how Plaintiffs' claim can feasibly be tried. *Id.* Defendants further suggest that as several Plaintiffs intend to prosecute the action regardless of class certification, the superiority requirement has not been met. *Id.*

First, given that thousands of the alleged class members reside in numerous states, intervention is impractical and

---

16. _____ Decl. refers to the aforementioned Plaintiffs' respective Declaration attached to Plaintiffs' Revised Memorandum of Law (Doc. No. 761).

would create reverse case management difficulties affecting Plaintiffs and Defendants alike. Second, there is no general rule which requires a trial plan as an essential element of the superiority requirement. *Ruiz v. American Tobacco Co.*, 180 F.R.D. 194 (D.P.R.1998), relied upon by Defendants, Defendants' Memorandum at 68, is distinguishable in that the statement in that case addressed plaintiffs' failure to deal with potential intra-class conflicts, an issue not present in this action. *Ruiz* at 197. Third, while some Plaintiffs may proceed with or without class certification, nevertheless, given the common questions going to Defendants' asserted violations and responsibility for Plaintiffs' damages, without certification many class members are likely to be deprived of any opportunity for the full relief to which they may be entitled. Moreover, larger classes in antitrust actions have been certified. *In re Visa Check/Master-Money Antitrust Litig.*, 192 F.R.D. at 73–74 (class of 4 million merchants approved under Rule 23(b)(3)), *aff'd*, 280 F.3d at 130; *In re Master Key Antitrust Litigation*, 528 F.2d 5 (2d Cir.1975) (class over 21,000 members); *In re Carbon Dioxide Antitrust Litig.*, 149 F.R.D. 229 (M.D.Fla.1993) (class in the "hundreds of thousands"). Finally, because the applicable statute of limitations has been tolled based on Plaintiffs' motion seeking class status, *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 353–54, 103 S.Ct. 2392, 76 L.Ed.2d 628 (1983), the possibility exists that if class certification is denied, a plethora of individual cases will be filed in other districts when the extensive litigation of the instant action strongly points in favor of a comprehensive resolution of this complex dispute by this court. As such, the court finds the proposed class certification pursuant to Rule 23(b)(3) is superior to other available forms of litigation available for the "fair and efficient adjudication" of the instant controversy. Fed.R.Civ.P. 23(b)(3). Further, based on their vigorous and tenacious prosecution of this action there can be no serious question that Plaintiffs are adequate class representatives. Defendants' sole rationale for Plaintiffs' asserted inadequacy as class representatives is based on the notion that individual defenses predominate, Defendants' Memorandum at 67–68, a position rejected by this court based on recent Second Circuit authority. Discussion, *supra*, at 66–70. As noted, Defendants do not dispute that Plaintiffs' counsel are qualified to represent the class.

▄▄▄ Plaintiffs alternatively, and in addition to Rule 23(b)(3), seek certification pursuant to Rule 23(b)(2). Plaintiffs' Reply Memorandum at 55–57. Defendants contend, Defendants' Memorandum at 70, that such an alternative or additional basis for certification is unavailable as, in this case, Plaintiffs' requests for relief "relate exclusively or predominantly to money damages." *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 145 (quoting Advisory Committee Notes to 1966 Amendments to Rule 23(b)(2)).[17] The

---

17. Defendants assert that Plaintiffs' Rule 23(b)(2) certification was not pleaded in the Second Amended Complaint. However, certification was alleged "pursuant to Fed. R.Civ.P. 23 as a proper action." Second Amended Complaint ¶ 1. While ¶ 44 refers to Rule 23(b)(3) the prayer for relief, Second Amended Complaint Section X, requests relief pursuant to Rule 23. Moreover, Plaintiffs' Memorandum of Law in Support of Class Certification filed February 24, 1994 (Doc. No. 70) and Plaintiffs' Revised Memorandum of Law argue for certification under Rule 23(b)(2) as well as (b)(3). Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion for Class Certification at 29–31; Plaintiffs' Revised Memorandum at 34–37. Given the requirement that federal pleadings be liberally construed, the court should treat Plain-

Second Circuit, in *Visa Check/MasterMoney, supra,* has held that once the district court has found an action "maintainable under any single category [of Rule 23(b)], there is no necessity of showing that it may also be brought under any other." *Id.* at 146–47 (quoting 8 Julian O. von Kalinowski, *et al., Antitrust Laws and Trade Regulations* § 166.03) (2d ed.1997) (bracketed material in original). Further, if certification is granted pursuant to both Rule 23(b)(3) and (b)(2) "major procedural problems can arise ... where different procedural consequences can attach depending on the subsection used." *Chateau De Ville Prods., Inc. v. Tams–Witmark Music Library,* 586 F.2d 962, 966 n. 14 (2d Cir.1978). Accordingly, because the court finds Plaintiffs' class should be certified pursuant to Rule 23(b)(3), it should not proceed further to determine Plaintiffs' alternative request for Rule 23(b)(2) certification. *Visa Check/MasterMoney, supra,* at 147.

Plaintiffs argue that the court may certify the class pursuant to both Rule 23(b)(2) and (3). Plaintiffs' Reply Memorandum at 59 (citing *Messier v. Southbury Training Sch.,* 183 F.R.D. 350, 353–54 (D.Conn.1998) (certifying class under Rule 23(b)(2) and (3) finding court may permit opt-out right to a(b)(2) claim)). However, in *Visa Check/MasterMoney, supra,* while acknowledging that the district court in that case certified the class under both Rule 23(b)(2) and (3), *Id.* at 146 (citing *Visa Check/MasterMoney,* 192 F.R.D. 68), the Second Circuit declined to determine the merits of certification pursuant to Rule 23(b)(2) and affirmed certification solely on the criteria of Rule 23(a)(3). *Id.* at 147. Specifically, the court noted that where, as in *Visa Check* substantial damages are a potential outcome, "the primary concern about certifying a class with significant damages under Rule 23(b)(2) is the absence of mandatory notice and opt-out rights." *Visa Check/MasterMoney, supra,* at 147 (citing cases). "Because those rights are guaranteed under Rule 23(b)(3), pursuant to which this action will now proceed, our inquiry need progress no further." *Id.* (citing cases).[18] Based on the Second Circuit's reasoning in *Visa Check/MasterMoney,* given that Plaintiffs seek substantial damages, this court should likewise decline to certify Plaintiffs' class pursuant to both Rule 23(b)(3) and (b)(2).

■ However, as Plaintiffs' motion is before the court for a report and recommendation, should the District Judge find class certification is not available pursuant to Rule 23(b)(3), alternatively, certification should be denied pursuant to Rule 23(b)(2). Class certification under Rule 23(b)(2) is unavailable where the relief requested relates predominantly to money damages. *Visa Check/MasterMoney, supra,* 280 F.3d at 145 (quoting Advisory Committee Notes to 1966 Amendments to Rule 23). For purposes of Rule 23(b)(2), a claim for money damages is said to predominate unless it is found to be incidental, *i.e.,* damages which automatically "flow to the class" once liability is established based on "objective standards" rather than requiring additional hearings or the need to determine any new or significant legal or fact

---

tiffs' motion as one brought pursuant to Rule 23(b)(2) and (b)(3).

**18.** In *Visa Check* the estimated damages were $63 billion, *Visa Check,* 192 F.R.D. at 88–89; in this case, assuming a class of only 10,000 and based on the 14 years that have elapsed since 1988, without trebling and interest, the

requested damages are $7 billion. Using Plaintiffs' start date of 1994, when the Second Amended Complaint was filed as suggested, without authority, by Plaintiffs, at oral argument, based on the alleged class of 14,000, the damages would be $4.2 billion.

issues. *Augustin v. Jablonsky*, 2001 WL 770839, *6 (E.D.N.Y.2001) (quoting *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 415 (5th Cir.1998)).

In this case, Plaintiffs' damages for lost earnings, constituting the basis for Plaintiffs' asserted losses, do not "automatically" flow to the class from the fact of liability. Rather, Plaintiffs' classwide damages will be determined based on the trier of fact's acceptance of a statistical analysis and expert economic opinion, which in turn are likely to be influenced by a variety of relevant factors drawn from the characteristics of the class, particularly factors relating to the Plaintiffs' earning capacities. *See* Carlton Dep. at 374 (damages to be assessed by on "individual characteristics of a plaintiff"). Thus, should the District Judge decline to certify Plaintiffs' class pursuant to Rule 23(b)(3), Plaintiffs' alternative request for certification under Rule 23(b)(2) should also be declined because Plaintiffs' request for relief, as pleaded in the Second Amended Complaint, does not abjure the substantial money damages nevertheless requested by Plaintiffs should certification be considered pursuant to Rule 23(b)(2) only. In these circumstances, the request for money damages renders the request for injunctive relief incidental, and the money damages request predominant.[19]

Moreover, Defendants acknowledged, Defendants' Memorandum at 70, a legal duty to reopen the practice track necessarily flows from any judicial determination of liability in this case rendering the need for a formal injunction, intended to mandate any reopening of the practice track, redundant. Accordingly, Plaintiffs' damages request predominates thus defeating eligibility for certification pursuant to Rule 23(b)(2).

## CONCLUSION

Based on the foregoing, Defendants' cross motion should be GRANTED; alternatively, Plaintiffs' motion for class certification pursuant to Rule 23(b)(3) should be GRANTED; alternatively, Plaintiffs' motion for certification pursuant to Rule 23(b)(2) should be DENIED.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure and Local Rule 72.3.

---

**19.** The court notes cases where the mere request for treble damages in an antitrust action was held to place the action outside the parameters of class certification under Rule 23(b)(2). *See Hall v. Burger King Corp.*, 1992 WL 372354, * 11 (S.D.Fla. Oct. 26, 1992) ("it is settled that where antitrust plaintiffs seek treble damages, certification under Rule 23(b)(2) is improper even if injunctive relief is sought at well"); *Christiana Mortgage Corporation v. Delaware Mortgage Bankers Association*, 136 F.R.D. 372, 381–82 (D.Del.1991) ("it is generally inappropriate in an antitrust suit seeking treble damages to certify a class under Rule 23(b)(2)"); *In re Sugar Industry Antitrust Litigation*, 73 F.R.D. 322, 341–42 (E.D.Pa.1976) (concluding that class certification under Rule 23(b)(2) is inappropriate where treble damages are "significant part" of the action's damage aspect); and *Al Barnett & Son, Inc. v. Outboard Marine Corp.*, 64 F.R.D. 43, 53 (D.Del.1974) (holding class certification in antitrust action was only available under Rule 23(b)(3) as recovery of treble damages was predominant consideration, rendering class certification under Rule 23(b)(2) inappropriate).

*Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.* Thomas v. Arn, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989); *Wesolek v. Canadair Limited,* 838 F.2d 55 (2d Cir.1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Plaintiffs and the Defendants.

SO ORDERED.